See appellate decisions, 98 F.3d 1159, 141 F.3d 1355.

**UNITED STATES of America,
Plaintiff,**

v.

**State of WASHINGTON,
et al., Defendants.**

**Civil Action No. 9213.**

United States District Court,
W.D. Washington,
at Seattle.

COMPILATION OF MAJOR
POST–TRIAL SUBSTANTIVE ORDERS
(January 1, 1995 through December 31, 1996)

TABLE OF CONTENTS

| ORDER | PAGE |
| --- | --- |
| Order Vacating Entry of Judgment (1/17/95) | 1187 |
| Order Denying Motion by Duwamish, Snohomish and Steilacoom Indian Tribes to Reopen Judgment Under Rule 60(b) (1/23/95) | 1188 |

Order Granting in Part and Continuing in Part Muckleshoot's Motion for Partial
Summary Judgment (7/5/95) 1191

Order re: Implementation of Shellfish Proviso, 898 F.S. 1453 (8/28/95) See Appendix

Order Granting Muckleshoot's Motion for Partial Summary Judgment (10/4/95) 1194

Memorandum Opinion and Order Granting in Part and Denying in Part Plaintiff's See Appendix
Motion to Alter or Amend Judgment, 909 F.S. 787 (12/18/95)

Order re: Granting Preliminary Injunction (3/22/96) 1196

Minute Entry: In Chambers Proceeding (4/11/96) 1199

Order Granting Motions for Approval of Settlement Agreements and Denying
Request that Dismissal Without Prejudice by Conditional on Payment of Defense
Costs and Attorney Fees (7/11/96) 1199

Order Granting Makah's Motion for Partial Summary Judgment and Denying
Oregon's Cross Motion for Summary Judgment and Washington's Motion for Stay
(11/4/96) 1245

Decision by the Special Master (11/26/96) 1247

## COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
### (Through December 31, 1996)
## ORDER VACATING ENTRY OF JUDGMENT

Subproceeding No. 89–3.

(January 17, 1995)

RAFEEDIE, District Judge.

The clerk is ordered to VACATE the entry of judgment entered on December 20, 1994.

The memorandum decision issued by this Court disposes only of the treaty interpretation issues and is only a partial judgment, which should not be separately entered.

Before the Court are still issues of injunctive relief, claims for equitable relief, time, place, and manner restrictions, if any, on shellfish harvesting, and other issues raised by the pleadings.

These and other issues cannot be resolved, for example, until there has been a determination of the location of shellfish beds covered by the Court's decision.

It was on these latter issues that the Court sought the parties' input and agreement, if possible, considered in light of the Court's treaty interpretation. To the extent that the parties are unable to agree on such issues, the Court will decide them.

Until final judgment has been entered, the status quo ante shall remain in effect. Accordingly, the recent motion by the intervenor growers for a stay pending appeal or for equitable relief is premature until a final judgment has been entered.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail, copies of this Order on counsel for the parties in this matter.

ORDER DENYING MOTION BY DU-
WAMISH, SNOHOMISH AND
STEILACOOM INDIAN TRIBES
TO REOPEN JUDGMENT UNDER
RULE 60(b)

Subproceeding No. 93–2

(January 23, 1995)

BARBARA JACOBS ROTHSTEIN,
District Judge.

THIS MATTER comes before the court on a motion by the Duwamish Indian Tribe, the Snohomish Indian Tribe and the Steilacoom Indian Tribe ("the tribes") under Fed.R.Civ.P. 60(b) to reopen a judgment entered in this case on March 23, 1979. Having reviewed the motion together with all documents filed in support[1] and in opposition, having heard oral argument, and being fully advised, the court finds and rules as follows:

## I. FACTUAL BACKGROUND

In 1974, United States District Court Judge George H. Boldt held that tribes in Washington Territory which had signed treaties in the 1850's relinquishing their aboriginal rights to land in exchange for the right to take fish at all usual and accustomed places were entitled to take up to fifty percent of the harvestable fish passing through their off-reservation fishing grounds. *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). *See also, State of Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

Among the tribes intervening in the case before Judge Boldt in 1974 to assert treaty fishing rights were the Duwamish, Snohomish, Steilacoom, Snoqualmie and Samish Indian Tribes. On September 13, 1974, Judge Boldt referred the issue of the treaty-tribe status of these intervenors to a magistrate. After holding several hearings, the magistrate issued a report concluding that none of the five intervenor tribes qualified as a successor to a treaty tribe. Pursuant to an appeal by the five tribes from the magistrate's report, Judge Boldt ordered a de novo evidentiary hearing in August of 1975, directed the tribes to submit additional evidence in March of 1976, and heard oral argument on the matter in January of 1977.

In February of 1978, Judge Boldt underwent surgery for an aortic aneurysm which occasioned a lengthy period of convalescence. Early in 1979, Judge Boldt asked to be relieved of his judicial duties because of his failing health. On February 16, 1979, two of the three moving tribes in this case requested that Judge Boldt be allowed to resolve the still pending issue of the five intervenor tribes' treaty status. In an order dated March 14, 1979, Chief Judge Walter T. McGovern granted the motion on the grounds that it was "in the best interests of judicial administration and economy, and in the interest of all parties." In a footnote, Judge McGovern stated that "[t]he court has been informed that Judge Boldt is willing, if requested, to consider and issue a ruling on this matter."

Judge Boldt issued his decision on March 23, 1979. In doing so, he adopted with minor changes the proposed findings of fact and conclusions of law submitted by the United States. On April 25, 1979, he issued a brief order denying the tribes'

---

**1.** Petitioners' motion to file an overlength brief in support of their motion to reopen the judgment is GRANTED.

motion for reconsideration. The Ninth Circuit affirmed the decision, 641 F.2d 1368 (1981), and the United States Supreme Court denied the tribes' petition for certiorari. 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).

The Duwamish, Snohomish and Steilacoom Tribes now move to reopen the judgment of March 23, 1979 pursuant to Fed. R.Civ.P. 60(b)(6) for the purpose of conducting discovery into the state of Judge Boldt's mental health at the time he rendered his decision. The motion is prompted by an article published on June 11, 1992 in the Seattle Post–Intelligencer which states that, according to Judge Boldt's death certificate issued in March of 1984, he suffered the onset of Alzheimer's Disease in 1978, the year before the decision at issue was made. This motion is opposed by the United States, the State of Washington, and numerous other tribes involved in the lengthy litigation over fishing rights in the state of Washington.

## II. LEGAL ANALYSIS

### A. Applicable Standard

Rule 60 governs relief from judgments and orders of the court. Rule 60(b)(6) provides as follows:

> (b) On motion and upon such terms as are just, the court may relieve a party or a party's legal representatives from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of the judgment.

The United States Supreme Court described the operation of this rule in *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988):

Rule 60(b)(6)... grants federal courts broad authority to relieve a party from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5). The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," while also cautioning that it should only be applied in "extraordinary circumstances."

(Footnotes and citations omitted.) Thus the question here is whether extraordinary circumstances exist in this case such that justice requires reopening Judge Boldt's decision of March 23, 1979. For the following reasons, the court concludes that the tribes' motion should be denied.

### B. Factors to be Considered

#### 1. Timeliness

The parties opposing the motion challenge its timeliness, emphasizing that all of the facts now brought to the court's attention about Judge Boldt's failing health and the circumstances surrounding his decision were known in 1979 with the exception of the information on the death certificate issued in 1984. The opposing parties stress that death certificates are matters of public record readily available on request.

While it is true that fifteen years have passed since the decision at issue and ten years since Judge Boldt's death, the court declines to deny the tribes' motion on this ground alone.[2] As the tribes' counsel

---

**2.** Insofar as the tribes seek to conduct discovery about the existence of any ex parte communications which may have affected Judge

Boldt's decision making ability, the court finds that this request is untimely. A motion for relief from a final order for reasons of

pointed out, it is not customary for litigants to comb a judge's death certificate in hopes of finding evidence supporting a challenge to the judge's competency at the time he rendered a decision.

### 2. Public Interest in Finality of Judgments

■ Even if the moving tribes should not be held strictly account able for the long delay in challenging Judge Boldt's decision, the court must still take into account the public interest in maintaining the finality of judgments. The law recognizes the need for stability in precedents and stare decisis. This case provides an excellent example of the damage that might result if parties to a case and the general public were unable to rely on court judgments.

The passage of time has markedly changed the landscape of this case. For many years now, state-tribal fish management plans have been drawn up and allocation decisions made in reliance on the 1979 judgment. Disturbing the judgment at this late date would prejudice many other parties who have depended on its finality. Moreover, in addition to damaging the interests of the parties in this particular case, there is the unmeasurable danger resulting from a precedent that would encourage parties to reopen judgments for the purpose of questioning judicial competency even long after the events in question.

### 3. Need for Correction of Injustice

■ But the moving tribes argue that the issue posed by this case brings the need for finality into direct conflict with the quest for justice, and that the need to correct an injustice should outweigh the need for finality. After carefully examining all of the events surrounding this case, the court concludes that, contrary to the moving tribes' contention, it is not confronted with this exceedingly difficult determination because no manifest injustice was done.

The moving tribes do not assert that they were prevented from receiving a full and fair hearing by virtue of being unable to submit relevant evidence or arguments. The record reveals that they were given ample opportunity to submit exhibits, present testimony and file briefs in support of their respective positions. They raise instead the possibility that Judge Boldt may have suffered from a mental impairment at the time he signed the final order of March 23, 1979 which rendered him incompetent to carry out his judicial functions.

But Judge Boldt was not the only judicial officer to review the moving tribes' contentions and reach the same conclusion. On March 7, 1975, Magistrate Robert E. Cooper issued a report setting forth his independent conclusion that none of the moving tribes had established their status as a treaty tribe or the successor to a treaty tribe. This report was based on five days of hearings as well as testimony and evidence submitted by the moving tribes.

More significantly, the Ninth Circuit reached the same result in affirming Judge Boldt's decision on appeal at 641 F.2d 1368 (9th Cir.1981). The moving tribes stress that the standard of review in such cases is not de novo, and that findings of fact are only reviewed for clear error. But it is apparent from the text of the appellate opinion that the Ninth Circuit did much more than that in this instance.

---

misconduct by an adverse party must be filed within one year after the order was entered. Rule 60(b)(3). Moreover, the tribes have no

evidence to support the premise that any such ex parte communications occurred.

After reviewing Judge Boldt's decision, the court concluded that the judge had applied the wrong standard in determining whether tribal structure had been maintained. The court went on to explain the proper scope of the inquiry and factors to be considered. Finally, the Ninth Circuit itself reviewed the evidence to determine whether, as a matter of fact, the groups in question had maintained an organized tribal structure since treaty time. The court concluded "[a]fter close scrutiny, ... that the evidence supported [the] finding of fact" that they had not done so, and that "the district court correctly resolved this question despite its failure to apply the proper standard." (emphasis supplied) 641 F.2d at 1373, 1374.[3]

Given the language in the Ninth Circuit opinion indicating that the court carefully examined the evidence presented by the moving tribes before deciding to affirm Judge Boldt's findings as correct, this court concludes that the moving tribes have failed to make the kind of showing of manifest error necessary to even consider reopening a judgment so many years after its entry. As the moving tribes acknowledge, the public interest in the finality of judgments is great, particularly in protracted, emotionally charged litigation like *United States v. Washington*, which aroused intense public reaction during the 1970's. Whereas the need for continued reliance on the finality of Judge Boldt's ruling is great, the court can find no countervailing need for disturbing that finality in order to correct a manifest error because the result does not rest on Judge Boldt's decision alone.

## III. CONCLUSION

The court concludes that the moving tribes have failed to demonstrate the existence of any extraordinary circumstances which would warrant reopening the final order of March 23, 1979 for the purpose of conducting discovery into Judge Boldt's mental health. Their motion is accordingly DENIED.

## ORDER GRANTING IN PART AND CONTINUING IN PART MUCKLESHOOT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### Subproceeding No. 86–5

### (July 5, 1995)

THIS MATTER comes before the court on a motion by the Muckleshoot Tribe for partial summary judgment on the question of clarifying two findings concerning the usual and accustomed fishing areas of the Lummi Indian Nation and the Swinomish Indian Tribal Community as previously adjudicated by the court. Having reviewed the motion together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

In 1974 and 1975, Judge George Boldt entered findings concerning the usual and accustomed fishing places of the Lummi Indian Nation and the Swinomish Indian Tribal Community. The Muckleshoot Tribe now moves for a clarification that those places as described by Judge Boldt do not include any portion of Puget Sound Commercial Salmon Management and Catch Reporting Area 10 ("Area 10").

### A. Compliance with Paragraph 25

Lummi and Swinomish both argue as a preliminary matter that Muckleshoot failed to follow the required procedure of

---

**3.** The United States Supreme Court denied the tribes' petition for certiorari. 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).

convening an official conference pursuant to Paragraph 25 of the permanent injunction in *United States v. Washington,* and then filing a separate subproceeding.[1] Although they are correct, they have not stated any practical reason for requiring technical compliance with Paragraph 25 under the circumstances of this case.

There is no question that both Lummi and Swinomish have had notice of the existence of the issue for several years. With regard to Lummi, Muckleshoot did convene and hold a conference. The court fails to see how Muckleshoot's failure to file a separate subproceeding prejudices Lummi or affects Lummi's ability to respond.

As for Swinomish, Muckleshoot brought the issue to the tribal community's attention in writing as early as 1991 and exchanged correspondence with Swinomish over the course of the next 2-1/2 years. See Exs. A, B, C, J, K, L and R to Dec. of Gregory O'Leary filed on April 6, 1995.

This is not a situation in which Muckleshoot seeks a factual or legal determination of a new issue. The only ruling sought is clarification of two findings in prior court orders. Since the parties have had ample notice, the court does not see the necessity for formal compliance with Paragraph 25.

### B. Lummi Nation Fishing Areas

Judge Boldt's Finding No. 46 at 384 F.Supp. at 360–61 in 1974 regarding Lummi's usual and accustomed fishing places at treaty times states in relevant part that they "included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *United States v. Washington,* 384 F.Supp. 312, 360–61 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Area 10 is roughly bounded on the north by the Edmonds–Kingston ferry lane. Muckleshoot insists that the Lummi adjudicated fishing places do not reach as far south as the northern boundary of Area 10.

In support of this contention, Muckleshoot offers the declarations of University of Washington geography professor Richard Morrill and Muckleshoot biologist Paul Hage as well as the 1989 testimony of Dr. Barbara Lane. Lummi moves to strike the testimony of these three witnesses.

■ As to Richard Morrill and Paul Hage, the court concludes that Lummi's motion has merit. Richard Morrill was not disclosed as a possible expert by the established deadline, and the court rejects Muckleshoot's argument that he qualifies as a rebuttal expert. Moreover, the declarations of Mr. Morrill and Mr. Hage constitute new evidence which Judge Boldt did not have before him. The court concludes that the declarations supplement the record rather than assisting the court in determining Judge Boldt's intent at the time of his decision.[2]

---

1. The Northern Tribes (Makah, Lower Elwha S'Klallam, Jamestown S'Klallam, Port Gamble S'Klallam, Skokomish, Suquamish and Nooksack) and the Tulalip Tribes also object to Muckleshoot's failure to follow the procedures outlined in Paragraph 25. They express no opinion on the merits of Muckleshoot's motion.

2. Based on the same reasoning, the court rejects Lummi's arguments in opposition to Muckleshoot's motion on the grounds of res judicata, the law of the case doctrine and failure to appeal the original ruling. All of these arguments presuppose that Muckleshoot is challenging or in some way seeking to supplement the original ruling. Instead it is merely asking for clarification or explication of the meaning of Judge Boldt's ruling.

However, Dr. Lane's testimony is on a different footing in that it was her research and the ensuing report which Judge Boldt consulted in reaching a decision on the Lummi usual and accustomed fishing places. Even though the testimony cited by Muckleshoot was not given by Dr. Lane until 1989 in another subproceeding, it addresses the very same language on which Judge Boldt relied in making his finding in 1974. Under these circumstances, the court concludes that Dr. Lane's testimony does not supplement the record, but assists the court in determining the original intent of the ruling.

Lummi also argues that Muckleshoot failed to list Dr. Lane as an expert for purposes of this subproceeding. While this is true, Dr. Lane is hardly a stranger to this litigation and the testimony invoked by Muckleshoot is already in the public record of another subproceeding. Under these circumstances, the court concludes that Dr. Lane's testimony should not be stricken. Instead Lummi will be given an opportunity to depose Dr. Lane and to submit an additional response to Muckleshoot's motion.

### C. Swinomish Indian Tribal Community Fishing Areas

In 1975, Judge Boldt entered Finding No. 6 at 459 F.Supp. at 1049, which stated that Swinomish's usual and accustomed fishing places included "the Skagit River and its tributaries, the Samish River and its tributaries and the marine areas of Northern Puget Sound from the Fraser River south to and including Whidbey, Camano, Fidalgo, Guemes, Samish, Cypress and the San Juan Islands, and including Bellingham Bay and Hale Passage adjacent to Lummi Island." *United States v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash.1978) (Orders of March 8, 1975 and April 18, 1975). The most southerly point of land in Judge Boldt's description is the southern tip of Whidbey Island, which is about seven miles north of the northernmost part of Area 10. Thus, Judge Boldt's Finding No. 6 does not include any part of Area 10.

The response filed by Swinomish includes argument about other orders entered by the court, a declaration from an anthropologist, and excerpts from oral and written testimony by Dr. Lane on subjects other than the finding at issue. But all of this argument and evidence is outside the very narrow scope of the issue before the court, which focuses on the proper interpretation of the language of Judge Boldt's Finding No. 6. None of the evidence offered by Swinomish addresses this narrow question.

Swinomish also argues that there is a genuine issue of material fact about whether Finding No. 6 encompasses some part Area 10 because the finding includes the marine areas surrounding Whidbey Island. Swinomish contends that the extent of those areas is ambiguous. Even assuming that Finding No. 6 might be construed to include marine areas surrounding Whidbey Island and that the actual extent of those areas is unclear, the court concludes that this ambiguity cannot be stretched to involve any waters in Area 10, which is a full seven miles south of Whidbey Island.

Muckleshoot's motion for partial summary judgment is accordingly GRANTED as to Swinomish. The usual and accustomed fishing places of Swinomish as previously adjudicated by the court in Finding No. 6 at 459 F.Supp. at 1049 do not include waters within Area 10.

Muckleshoot's motion for partial summary judgment is CONTINUED as to Lummi. Lummi is directed to inform the court within ten days of the date of this order about whether counsel wishes to depose Dr. Lane and if so, when the deposi-

tion will be scheduled and when Lummi's additional response to Muckleshoot's motion will be filed.

## ORDER GRANTING MUCKLESHOOT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### Subproceeding No. 86–5

### (October 4, 1995)

This matter comes before the court on a motion by the Muckleshoot Tribe for partial summary judgment clarifying a finding concerning the usual and accustomed fishing areas of the Lummi Indian Nation. In a prior order entered on July 6, 1995, this court continued the motion so that Lummi could depose Dr. Barbara Lane. Having reviewed the supplemental briefs submitted by both Lummi and Muckleshoot as well as the other documents filed in support and in opposition, the court finds and rules as follows:

In 1974, Judge George Boldt entered Finding No. 46, which provides in relevant part that Lummi's usual and accustomed fishing places at treaty times "included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay." *United States v. Washington,* 384 F.Supp. 312, 360–61 (W.D.Wash. 1974), *aff'd* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) Muckleshoot now moves for a clarification that Judge Boldt's Finding No. 46 does not include any portion of Puget Sound Commercial Salmon Management and Catch Reporting Area 10 ("Area 10").

Area 10 is roughly bounded on the north by the Edmonds–Kingston ferry lane. Muckleshoot contends that the Lummi fishing places as adjudicated by Judge Boldt do not reach as far south as the northern boundary of Area 10.

The key to resolving this controversy lies in determining what Judge Boldt meant in precise geographic terms by his use of the phrase "the present environs of Seattle." The findings themselves do not define the phrase.

However, this same phrase appears in paragraph 4 on page 26 of Dr. Barbara Lane's "Anthropological Report on the Identity Treaty Status and Fisheries of the Lummi Indian Tribe" (1973) (Exhibit USA 30):

> The traditional fisheries of the post-treaty Lummi included reef net sites in the San Juan Islands, off Point Roberts, Birch Point, Cherry Point, and off Lummi Island and Fidalgo Island. Other fisheries in the Straits and bays from the Fraser River south to <u>the present environs of Seattle</u> were utilized.

(emphasis supplied) Judge Boldt specifically cited pp. 23–26 of this report in support of Finding No. 46, 384 F.Supp. at 360, and the parties do not dispute that paragraph 4 of page 26 of Dr. Lane's report is the source of the phrase in question.

When asked by the parties to this subproceeding during her recent deposition on August 16, 1995 about her use of the phrase "present environs of Seattle," Dr. Lane testified that she was referring to a location no farther south than present-day Mukilteo. She also testified that, in preparing the Lummi report cited by Judge Boldt, she found no evidence of any Lummi treaty-time fisheries extending farther south than the area around Fidalgo Island. Both Mukilteo and Fidalgo Island lie north of the northern boundary of Area 10.

Lummi argues that the precise geographic meaning assigned by Dr. Lane to the phrase "present environs of Seattle" when she wrote her report was never communicated to Judge Boldt in any testimony or other evidence. Therefore, Lummi con-

tends, it is not possible to conclude that Judge Boldt assigned the same geographic meaning to those words.

Even assuming that Judge Boldt was never apprised of Dr. Lane's specific meaning, the court does not consider this determinative of whether it can be concluded that Judge Boldt implicitly adopted her meaning by using her language. It is abundantly clear from Judge Boldt's findings in *United States v. Washington* that he relied heavily on Dr. Lane's research and reports. In the decision containing Finding No. 46 now at issue, Judge Boldt expressly acknowledged the debt he owed to and the reliance he placed on Dr. Lane's written reports in reaching his own conclusions about the issues before him:

> The Court finds that in specific facts, the reports of Dr. Barbara Lane, Exhibits USA–20 to 30 and USA–53, have been exceptionally well researched and reported and are established by a preponderance of the evidence.

384 F.Supp. at 350. This court accordingly concludes that, by citing to and adopting Dr. Lane's language about "the present environs of Seattle" without any amending explanation, Judge Boldt also meant to adopt her underlying meaning. In other words, when Judge Boldt referred in his findings to factual information or geographic descriptions contained in Dr. Lane's reports, he also intended, unless otherwise indicated by specific language, to incorporate Dr. Lane's definitions and reasoning into his own conclusions. Indeed, it would not make sense to find that Judge Boldt adopted Dr. Lane's words but not her meaning without in any way in-

forming the reader that he was deviating from her intended definition of the described geographic area.[1]

Lummi contends that Muckleshoot seeks to relitigate or reinterpret Judge Boldt's finding in the guise of clarification by reading into it evidence which was not before him. As discussed above, this court disagrees, concluding instead that it was Judge Boldt's specific intent to rely on Dr. Lane's research and sources. Therefore, this court concludes that Judge Boldt intended to adopt Dr. Lane's reasoning as well as her conclusions unless otherwise specifically stated. There is no indication that Judge Boldt intended to construe the geographic scope of "the present environs of Seattle" differently from Dr. Lane.

In the alternative, even if Judge Boldt's Finding. No. 46 cannot be clarified by adopting Dr. Lane's definition of the "present environs of Seattle," this court notes that Judge Boldt's decision reserved continuing jurisdiction, among other things, to determine the location of a tribe's usual and accustomed fishing grounds "not specifically determined by Final Decision No. 1," as well as "such other matters as the Court may deem appropriate." 384 F.Supp. 312, 419.

If Dr. Lane's definition is not adopted, then the meaning of the phrase in question here was "not specifically determined by Final Decision No. 1," since Judge Boldt failed to define his use of the term in precise geographic terms. Therefore, pursuant to the reservation of jurisdiction cited above, this court has the authority to make a supplemental finding.[2]

---

1. Lummi attempts to argue that Judge Boldt really meant Puget Sound or Seattle when he referred to "the present environs of Seattle." A review of the relevant language in his finding No. 46 together with the cited paragraphs of Dr. Lane's report lends no support to Lummi's theory.

2. Because the court is making a supplemental finding pursuant to a reservation of jurisdiction in the original order concerning an issue which was not originally addressed, and not correcting an error in a final judgment, Lummi's discussion of Fed. R. Civ. 60(b) is entirely inapposite.

The sole, narrow issue before the court concerns the proper interpretation of "the present environs of Seattle" as used in Finding No. 46. The court concludes that the only authority capable of clarifying the meaning of that phrase is Dr. Lane, the person who wrote those words and from whose report Judge Boldt extracted that language for use in Finding No. 46. Based on Dr. Lane's testimony in her deposition of August 16, 1995 in which she explained the meaning she intended to attach to those words when she wrote her report, the court makes a supplemental finding that the phrase "the present environs of Seattle" as used in Finding No. 46 describes an area which extends no farther south than Mukilteo. Thus, under Finding No. 46, the Lummi have no usual and accustomed fishing places in Area 10.

Muckleshoot's motion for partial summary judgment regarding the issue of whether Lummi has any usual and accustomed fishing places in Area 10 is accordingly GRANTED.

### ORDER RE: GRANTING PRELIMINARY INJUNCTION

Subproceeding No. 96–1

(March 22, 1996)

ON FEBRUARY 29, 1996, this court granted a motion by the Makah Indian Tribe, the Quinault Indian Nation and the Hoh Indian Tribe for a preliminary injunction. This order sets forth the court's reasons for that decision.

## I. BACKGROUND

The three petitioning tribes participate in the treaty Indian blackcod fishery har-

vested in the Pacific Ocean off the coast of Washington. From its inception in 1989 until the 1995 season, the blackcod fishery had been exclusively a longline fishery.

On January 25, 1996, the petitioning tribes filed a request for determination regarding the management and allocation of the treaty Indian blackcod fishery. They alleged that the Quileute Indian Tribe, which also participates in the blackcod fishery, began using pot gear in 1995 to catch blackcod, thus permitting Quileute fishers to greatly augment their fishing power, and that the Quileutes were planning to increase markedly their pot gear capacity in the 1996 season.[1]

The petitioning tribes contended that, absent relief from this court in the form of a preliminary injunction, Quileute fishers would largely preempt the longline fisheries of the petitioning tribes or force them to use pots or other more efficient gear in order to compete with the Quileutes. In the absence of an intertribal allocation, the petitioning tribes argued that such an unrestricted fishery would injure all of the tribes by leading to overcapitalization of the fleet, concentration of the fishery in a small number of individuals, business failures and unemployment. They asked the court to preserve the status quo by protecting the longline blackcod fishery.

In addition, the petitioning tribes alleged that the Quileute Tribe's fisheries south of Destruction Island are outside of its usual and accustomed fishing grounds. They asked the court to enjoin the Quileute Tribe from fishing in that area.

In its response, the Quileute Tribe agreed with the petitioning tribes' underlying request for an equitable allocation of the treaty blackcod fishery among the four

---

1. During the 1995 season, one Quileute fisher used 100 pots. At oral argument, counsel for the Quileute Tribe stated that several Quileute fishers intended to use a total of 335 pots in the 1996 season.

coastal tribes.[2] However, it asked the court to deny preliminary injunctive relief on the grounds that the Quileute Tribe's use of pots will not preempt the petitioners' fisheries or lead to economic decline. The Quileute Tribe also disputed petitioners' allegations about the geographic boundaries of its usual and accustomed fishing areas.

## II. LEGAL ANALYSIS

### A. Standard for Preliminary injunction

■■■ The four equitable criteria for determining the appropriateness of preliminary injunctive relief are well established: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. *Confederated Tribes v. Baldrige*, 898 F.Supp. 1477, 1483 (W.D.Wash.1995), citing *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). A preliminary injunction is warranted if the petitioners demonstrate probable success on the merits and a possibility of irreparable injury or a fair chance of success on the merits and the balance of hardships tipping sharply in their favor. *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1388 (9th Cir.1988).

Having carefully reviewed the briefs and accompanying declarations and exhibits, and having heard oral argument, the court concludes that preliminary injunctive relief should be granted to maintain the status quo as it existed in the 1995 fishing season.

### B. Use of Pot Gear

■ The evidence before the court indicates that vessels using pot gear can significantly increase their catch efficiency. Dec. of Dr. James Crutchfield, Exh. A at pp. 8–11; Dec. of Stephen H. Joner, pp. 9–10. Although the Quileute Tribe argues that the difference in catch efficiency between longline and pot gear has not been quantified for the blackcod fishery, it does not seriously dispute the improved catch rate for pot gear. Indeed, the hope of enhancing their ability to compete in the blackcod fishery is precisely why the Quileute fishers wish to expand their use of pot gear.

The evidence before the court further suggests that if the Quileute Tribe expands its use of pot gear in a wide-open treaty blackcod fishery, other tribal fishers will be forced to either refit their current vessels or buy larger pot-equipped vessels in order to remain competitive. Left uncontrolled, this situation would result in fewer vessels employing less personnel fishing shorter seasons. Dec. of Dr. Crutchfield, Exh. A at pp. 11–14.

The Quileute Tribe tries to disavow the prospect of economic distress and decline offered by the petitioning tribes, but presents no evidence to refute it. The Quileute Tribe contends that the petitioners' arguments about threatened preemption of their fisheries are without merit because Quinault's percentage of the catch actually increased and Makah's total catch doubled from 1994 to 1995. This misses the ultimate point of petitioner's argument, which is that the Quileute Tribe's unrestricted use of pot gear threatens to alter the nature of the fishery, which in turn bodes

---

**2.** While there is general agreement on the need for an equitable intertribal allocation, the tribes do not necessarily concur on the factors to be considered, the weight to be given those factors if considered, or the standard for determining an appropriate allocation. The court need not reach these issues at this time.

ill for the overall health of the tribal economies.

The court is convinced that the Quileute Tribe's unrestricted use of pot gear threatens to significantly change the nature of the fishery by forcing other tribes to invest in pot gear. This would in turn lead to overcapitalization of the fishery, inability of smaller vessels which are incapable of switching to pot gear to compete in the fishery, lower employment, and inability of individual tribes to manage their share of the fishery to meet their own tribal objectives and economic needs. In short, unrestricted use of pot gear could have a destructive, destablilizing effect on the already fragile economies of the participating tribes.

Thus, the court finds that petitioners have established that irreparable injury will result if the use of pot gear in the treaty blackcod fishery remains unrestricted without any concurrent agreement or determination about an equitable intertribal allocation of that fishery.

■ The court also finds that the balance of hardships tilts sharply in favor of the petitioning tribes' argument that the use of pot gear should be restricted until the issue of apportioning the blackcod fishery is resolved. Maintaining the status quo from the 1995 season will permit Quileute fishers to use their pot gear to harvest roughly one-fourth of the overall quota,[3] while ensuring that the nature of the blackcod fishery as a whole is not altered to the detriment of tribal economies.

Moreover, there is no question that the petitioning tribes have raised serious questions on the merits about the need for an equitable allocation of the blackcod fishery so as to preserve each coastal tribe's treaty fishing rights.

### C. Usual and Accustomed Fishing Areas

Regarding the issue of whether the area south of Destruction Island is one of the Quileute Tribe's usual and accustomed fishing places, the court concludes that petitioners have raised serious questions on the merits.[4]

However, the court finds that petitioners have not shown any likelihood of irreparable injury resulting from continued fishing efforts by the Quileute Tribe for fish other than blackcod in the contested area pending the resolution of the dispute. As for the Quileute Tribe's blackcod fishery in that area, the court will enjoin Quileute fishers from using more than 100 pots, the status quo from the 1995 season, for the reasons outlined above.

### III. CONCLUSION

The petitioning tribes' motion for a preliminary injunction is GRANTED. For

---

3. The court notes that if the overall blackcod quota were divided equally among the four coastal tribes, the Quileute would be entitled to harvest no more than one-fourth of the total. By noting this, the court does not mean to suggest that this is necessarily the appropriate equitable allocation standard. The court is also aware that one of the four coastal tribes, the Hoh, does not participate in the blackcod fishery, although it hopes to enter the fishery soon.

4. There appears to be a factual dispute among the parties as to whether petitioners complied with the requirements of the Order Modifying Paragraph 25 of the Permanent Injunction for a conference on this issue before filing a request for determination. Given the underlying circumstances and current posture of this case, the court believes that nothing would be gained by dismissing this claim even if there was not strict compliance with Paragraph 25. Instead, the court has asked the parties to confer with each other about the best way to present the issue to the court for final determination.

the 1996 treaty blackcod fishery, the Quileute Tribe shall comply with the following restrictions: (1) the Quileute Tribe's total blackcod catch shall not exceed 27% of the overall treaty blackcod quota, and (2) the number of pots used in the blackcod fishery south of Destruction Island shall not exceed 100.

MINUTE ENTRY – IN CHAMBERS PROCEEDINGS:

Subproceeding No. 96–1

(April 10, 1996)

The court has reviewed the Quileute Tribe's motion to alter or amend the judgment together with the petitioning tribes' opposition, and DENIES the motion. The court finds that the Quileute Tribe has failed to establish manifest injustice or any other basis for reconsidering the court's balancing of the equities in this case.

ORDER GRANTING MOTIONS FOR APPROVAL OF SETTLEMENT AGREEMENTS AND DENYING REQUEST THAT DISMISSAL WITHOUT PREJUDICE BY CONDITIONAL ON PAYMENT OF DEFENSE COSTS AND ATTORNEY FEES

Subproceeding No. 86–5

(July 9, 1996)

THIS MATTER comes before the court on motions seeking an order approving three settlement plans reached among various groups of tribes, and on a request by four tribes that the dismissal of this case be conditional on payment of their defense costs and attorney fees by the Muckleshoot and Nisqually Tribes. Having reviewed the motions together with all documents filed in support and in opposition, the court finds and rules as follows:

The three agreements in question are as follows:

1. March 15, 1996 Agreement

The Nisqually, Muckleshoot, Puyallup, Squaxin Island, Suquamish and Tulalip Tribes present an Intertribal Salmon Allocation Plan for South Puget Sound dated March 15, 1996, which has been approved and executed by authorized representatives of the party tribes.

2. April 23, 1996 Agreement

The Muckleshoot, Nisqually and Makah Indian Tribes present a settlement reached among the three tribes dated April 23, 1996, which has been approved by resolution of all three tribal governing bodies and executed by the tribal chairs.

3. May 28, 1996 Agreement

Thirteen tribes have entered into and their tribal governments have ratified a Settlement Agreement Regarding 1996–1999 (2000) Management Agreement for Puget Sound and Ocean Fisheries dated May 28, 1996. This agreement supersedes two previously filed agreements dated August 10, 1995 and May 9, 1996. The thirteen tribes include the Squaxin Island, Puyallup, Makah, Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam, Skokomish, Lummi, Suquamish, Nooksack, Stillaguamish, Swinomish and Upper Skagit Tribes.

Having reviewed all of the memoranda submitted concerning the above-described agreements, and having determined that there is no objection to approving the agreements, the court hereby grants all three of the motions for approval.

This approval is made with the understanding that each agreement only binds signatory parties to that agreement, and that, where a party signed more than one plan and those plans have inconsistent pro-

visions, the party will be bound by the provision resulting in the most restrictive fishery.

In response to a concern raised by the state of Washington, the court clarifies that the May 28, 1996 agreement is not intended to and does not modify prior agreements and court orders regarding tribal/state relations. Nor does the May 28, 1996 agreement alter any previous order, agreement or plan including any other party than the signatories to the May 28, 1996 agreement. The court further clarifies that the May 28, 1996 agreement does not preclude tribal fish managers from taking measures consistent with the Pacific Salmon Treaty and its implementing legislation.

 Finally, the court denies the request by the S'Klallam and Skokomish Tribes that dismissal of this subproceeding be made conditional on payment by the Muckleshoot and Nisqually Tribes of all or a portion of the S'Klallam and Skokomish Tribes' attorney fees and costs incurred in defending this subproceeding since August of 1995. Having reviewed the memoranda filed on this subject, the court is not convinced that Muckleshoot and Nisqually should be held responsible for paying the requested fees and costs. Muckleshoot and Nisqually had legitimate concerns which prompted them not to agree to dismissal of the case in August of 1995. Since then, the tribes involved in this litigation have concluded three agreements which will bring much needed stability to the fisheries involved for at least the next five years. At least some of the fees and costs incurred by the S'Klallam and Skokomish Tribes since August of 1995 were expended in a successful effort to conclude the May 28, 1996 agreement, which will benefit them. The court accordingly finds no basis for conditioning dismissal of this case on the requested award of fees and costs.

The motions to approve the agreements of March 15, 1996; April 23, 1996 and May 28, 1996 are GRANTED. The request by the S'Klallam and Skokomish Tribes for an award of fees and costs is DENIED.

## SETTLEMENT AGREEMENT REGARDING 1996–1999 (2000) MANAGEMENT AGREEMENT FOR PUGET SOUND AND OCEAN FISHERIES

Amending and Replacing August 10, 1995, Management Plan

Subproceeding No. 86–5

(May 28, 1996)

1. AGREEMENT ................................................ 1201

2. TERM ...................................................... 1203

3. EFFECTS OF ADJUDICATION OF U & A FISHING AREAS ....... 1203

4. INTERTRIBAL SHARING OF CHINOOK SALMON ............... 1204
 4.1 Scope .............................................. 1204
 4.2 Chinook Management and Allocation Basis ........... 1204
 4.3 Context and Basis of Agreement .................... 1204
 4.4 Management Intent ................................. 1205
 4.5 1996–1999 Limitations on Preterminal Treaty Fisheries ... 1205
 4.6 Bellingham Bay Treaty Chinook Fisheries ........... 1206
 4.7 Future Chinook Allocation and Management Plans .... 1206
 4.8 Management Information ............................ 1207
 4.9 Review ............................................ 1207

 4.10 Post Season Audits of Chinook 1207

5. INTERTRIBAL SHARING OF SOCKEYE 1207
 5.1 Scope 1207
 5.2 Sockeye Tribes 1207
 5.3 Non–Treaty Share 1208
 5.4 Intertribal Allocation of Fraser River Sockeye 1208
 5.5 Intertribal Allocation of Puget Sound Sockeye 1209

6. INTERTRIBAL SHARING OF COHO SALMON 1210
 6.1 Scope 1210
 6.2 Non–Treaty Harvest Allocation 1210
 6.3 Coho Harvest Limitations Applicable to Treaty Preterminal Fisheries 1210
 6.4 Terminal Shares—South Sound 1212
 6.5 Paybacks 1214
 6.6 Terminal Shares 1215
 6.7 Non–Local Terminal Area Interceptions 1216

7. INTERTRIBAL SHARING OF CHUM SALMON 1219
 7.1 Scope 1219
 7.2 British Columbia Chum Salmon Allocation 1219
 7.3 Puget Sound Chum Salmon Allocation 1220
 7.4 Management for Intertribal Sharing 1220

8. TECHNICAL WORK 1224

9. PROCEDURAL LIMITATIONS 1226

10. COVENANT NOT TO USE 1227

11. PRINCIPLES 1228

12. THIRD PARTY BENEFICIARIES 1228

13. EFFECTIVE DATE 1228

14. AUTHORIZATION AND COUNTERPARTS 1228

## MAY 28, 1996, SETTLEMENT AGREEMENT

## REGARDING

## 1996–1999 (2000) MANAGEMENT AGREEMENT FOR PUGET SOUND AND OCEAN FISHERIES

## 1. AGREEMENT.

1.1 This agreement is entered this 28th day of May, 1996, by and between the Puyallup Indian Tribe, the Squaxin Island Tribe, the Makah Indian Tribe, the Lummi Indian Nation, the Upper Skagit Tribe, the Swinomish Indian Tribal Community, the Suquamish Indian Tribe, the Stillaguamish Indian Tribe, the Skokomish Indian Tribe, the Nooksack Indian Tribe, the Lower Elwha S'Klallam Tribe, the Jamestown S'Klallam Tribe, and the Port Gamble S'Klallam Tribe (hereafter the "Signatories".). The Muckleshoot Indian Tribe, the Nisqually Indian Tribe, The Tulalip Tribes and the State of Washington are not parties to this Agreement.

1.2 The Signatories desire to settle for a term of years the harvest allocation claims between them in Subproceeding 86–5 of *United States v. Washington,* Civil No. C71–9213, United States District Court for the Western District of Washington. These claims and this settlement agreement concern harvest allocation. Issues of conservation needs, primary rights

and the total amounts of harvest available for allocation are expressly excluded. The issue of usual and accustomed fishing areas is, except as expressly provided herein, also expressly excluded.

1.3 This Agreement modifies, replaces and supersedes the document entitled the 1996–1999 (2000) Management Plan For Puget Sound And Ocean Fisheries, dated August 10, 1995 (the "August 10 Han") and submitted to the Court for adoption as a Court Order on that same date. This Agreement represents a compromise of the Signatories positions regarding the equities of allocation of harvestable treaty salmon in the case of *United States v. Washington.* This Agreement is not intended to serve as a basis for establishing equitable allocation principles outside the context of this Agreement or for determining what might constitute an equitable allocation of harvestable treaty salmon among the Signatories after the Agreement expires.

1.4 The terms of this Agreement are binding upon the Signatories. The Signatories agree to advocate these terms before the Court in any trial in Subproceeding 86–5 or any other litigation in which the terms of this Agreement are at issue. The obligation of advocacy shall be satisfied by the Suquamish, Puyallup or the Squaxin Island Tribe, if, at the request of any Signatory, the Suquamish, Puyallup or the Squaxin Island Tribe shall file or cause to be filed a statement that it supports the terms of this Agreement and is bound by the terms of this Agreement. Any Signatory is free to take any position it chooses with regard to a petitioner that seeks relief greater in extent or longer in duration than is specified in this Agreement, provided that no Signatory shall disavow the terms of this Agreement.

1.5 This Agreement sets forth intertribal principles for sharing salmon and certain sharing regimes. These regimes shall be in force for the next four years and shall apply to the harvest of salmon taken in the Ocean, the Strait of Juan de Fuca, the San Juan Islands, and Puget Sound. Unless expressly provided herein, nothing in this Agreement shall affect or alter the provisions of any other intertribal agreement or prior orders of the court regarding treaty fisheries, including the 1996–1999 (2000) Management Plan for Puget Sound Fisheries Area 10 and (the "Area 10 And South Plan") to which the Squaxin Island, Puyallup and Suquamish Tribes are signatories. Nothing in the Area 10 and South Plan shall affect or alter the provisions of this Agreement.

1.6 This Agreement does not serve as the comprehensive agreement referred to in certain previous court orders and agreements between Tulalip and other tribes. Nothing in this Agreement shall modify, amend, or supersede the "Stipulated Settlement Agreement of Swinomish Tribal Community and the Tulalip Tribes dated June 9, 1983 (Docket No. 9071), or the Court's Order Approving Settlement Agreement Between Swinomish Tribal Community and Tulalip Tribes Re Puget Sound Fishing Area Claims dated July 8, 1983 (Docket No. 9190) that incorporated the Settlement Agreement by reference.

1.7 References to SSMAP refer to The Salmon and Steelhead Management and Allocation Plan ("SSMAP"), dated August 31, 1989, which was submitted to the Court as an attachment to the Mediator's Final Report on September 12, 1989 (Docket No. 11381). All references herein to SSMAP are for convenience only and do not imply adoption of SSMAP, in whole or in part.

1.8 Certain provisions of this Agreement require consent of the "affected parties" before the Signatories may take action mentioned in such provisions. As used in such provisions, the term "affected

parties" means all tribal parties who, after notice, indicate that such action would affect their interests. For actions that this Agreement contemplates the Signatories will take during preseason planning, the Signatories agree that notice to all affected parties' fisheries directors shall be notice to all affected parties.

1.9 The Signatories agree that they will make good faith efforts to commit the necessary effort and resources to fulfill the requirements of this Agreement.

1.10 This Agreement when approved by the Court shall be entered as an enforceable Order of the Court Prior to July 1 of 1996 and prior to June 1 of each year thereafter, any Signatory may file with the Court an annual management plan for the Puget Sound and ocean fisheries developed pursuant to this Agreement and, in the event that such plan is contested, any Signatory may request the Court to adopt the annual plan as a Court Order.

## 2. TERM

2.1 The term of this Agreement shall be a four year period beginning at the end of the 1995/1996 winter troll fishing season and continuing through the end of the 1999/2000 winter troll fishing season. If on or before April 1, 1999, the Signatories have not agreed to an allocation agreement addressing treaty fisheries for the 2000/2001 fishing season, then the term of this Agreement shall be extended for one additional year through the end of the 2000–2001 winter troll fishing season.

2.2 The term of the Agreement recognizes the fact that, at present, there is insufficient agreed-upon information on stock composition in the various fisheries to permit adequate accounting of impacts and allow for the formation of a consensus on long term management and allocation plans. The intent of this Agreement is to create the stability in fisheries and inter-tribal relations for the affected parties to undertake the technical and policy work tasks that are needed in order to achieve a longer term intertribal sharing regime as outlined in Section 8 of this Agreement.

## 3. EFFECTS OF ADJUDICATION OF U & A FISHING AREAS.

3.1 During the term of this Agreement, the conduct of fisheries by the Swinomish and/or Lummi tribes in Areas 9 and 10, shall be governed by the following provisions.

3.1.1 Conduct of Fisheries in Area 10.

a. Lummi. The Lummi Nation will not authorize or conduct fisheries in Washington Department of Fish and Wildlife Commercial Salmon Catch Management and Reporting Area 10 ("Area 10") during the term of this Agreement. The Lummi Nation will not authorize or conduct fisheries in Area 10 after the term of this Agreement unless it first secures a judicial determination that it has treaty fishing rights in Area 10.

b. Swinomish. As a result of the Court's July 5, 1995 Order, the question of Swinomish usual and accustomed fishing places in Area 10 may remain to be determined. The Signatories to this Agreement agree not to oppose a request for determination by the Swinomish Tribe regarding its usual and accustomed fishing places in Area 10 during the term of this Agreement.

3.1.2 Conduct of Fisheries in Area 9.

a. If the Lummi Tribe shall prevail in Subproceeding 89–2 then the Lummi Tribe agrees not to exercise any fishing rights which may be confirmed in Subproceeding 89–2 during the term of this Agreement.

b. The Swinomish Tribe may participate in Area 9 test and evaluation fisheries for any species of salmon, conducted consistent with provisions of this Agreement. Nothing in this Agreement shall preclude any tribe from participating in any Subproceeding concerning the adjudication of Swinomish usual and accustomed fishing places in Area 9; provided however that all Signatories agree not "to initiate" any legal challenge to Swinomish usual and accustomed fishing places in Area 9 during the term of this Agreement. Specifically, for research/test fisheries directed at chum salmon under provisions of Section 7.4.8 of this Agreement, the Swinomish Tribe shall participate and cooperate in the planning, acquisition of necessary funds, test harvest, and analysis of the results. Swinomish participation in test fisheries shall be under provisions of Section 7.4.8 and accounting of test catches shall be governed by existing provisions of the Puget Sound Salmon Management Plan (PSSMP). In fisheries, conducted under provisions of Section 7.4.8 that do not meet the test fishery criteria of PSSMP, i.e. evaluation fisheries, the Swinomish Tribe agrees to comply with the following conditions:

i) Conduct its fishery in areas that are within the Swinomish usual and accustomed fishing places.

ii) Comply with the annual experimental design called for by Section 7.4.8 of this Agreement.

iii) Demonstrate that its fishery will not exceed its allowable harvest, by providing appropriate limitations, such as closing the area west of the Foulweather—Liplip line, and implementing limits on the number and types of boats and gear.

iv) Limit catches to the levels established by the test/evaluation design.

## 4. INTERTRIBAL SHARING OF CHINOOK SALMON.

4.1 Scope. This section applies to the harvest of chinook salmon stocks that originate and are taken in Puget Sound, the Strait of Juan de Fuca, the San Juan Islands and the Point Roberts Area. Although this section prescribes no specific management measures for ocean fisheries, the harvest of Puget Sound chinook stocks taken in the ocean (including Area 4B during the ocean management period) are taken into account.

4.2 Chinook Management and Allocation Basis.

4.2.1 Escapement Policy. This chapter prescribes no changes in escapement policies established in the Puget Sound Salmon Management Plan regarding chinook.

4.2.2 Treaty/Non-treaty Allocation. This chapter prescribes no changes in Court-determined provisions governing Treaty/Non-treaty allocations (i.e., 50/50 sharing between Treaty and Non-treaty); nor does it change the existing management and allocation basis of the various races of chinook (e.g., spring chinook, summer/fall chinook).

4.3 Context and Basis of Agreement. At the time this section was developed, relatively few Treaty fisheries targeting on Puget Sound chinook existed in Puget Sound. The non-treaty recreational fishery, the Strait of Juan de Fuca and San Juans treaty troll fisheries, and, to a lesser extent, the Strait of Juan de Fuca Treaty set net fishery all target on mixed Puget

Sound chinook stocks. The limited scope of commercial fisheries for chinook salmon largely is a consequence of the depressed condition of many Puget Sound chinook stocks and the paucity of information on stock-specific fishery impacts.

4.4 Management Intent. The intent of this section is to support Puget Sound chinook salmon rebuilding efforts now underway pursuant to the Pacific Salmon Treaty and state and tribal management and enhancement programs. To this end, the Signatories agree to:

4.4.1 freeze at existing levels Treaty chinook fisheries in preterminal and mixed terminal areas. Fisheries shall be limited only to those authorized during the 1989–95 period, until the Signatories agree that:

a. currently-depressed Puget Sound chinook stocks can support greater harvests;

b. additional technical information and capabilities are available to improve management options (e.g., shaping of fisheries); and,

c. in the absence of closures required for conservation, a Treaty chinook troll fishery in the San Juan Islands may be opened under the same regulations used during the years 1989–1995.

4.4.2 seek complementary management actions in non-treaty fisheries to ensure that all affected parties and the State of Washington are contributing equally to rebuilding efforts.

4.5 1996–1999 Limitations on Preterminal Treaty Fisheries. The fishery limitations prescribed in this Section 4 are the result of the low runs anticipated and are in no way intended to define the potential extent of Treaty chinook fisheries. At the end of the term of this Agreement, these limitations shall be re-evaluated to determine the extent to which the limitations should be relaxed, expanded, otherwise modified, or terminated. During the term, taking into account the depressed condition of Puget Sound chinook stocks and the need for harvest constraints, the tribes agree:

4.5.1 to permit no new treaty fisheries targeting on Puget Sound chinook salmon in any preterminal or mixed terminal areas of Puget Sound, unless otherwise agreed;

4.5.2 to permit no expansion of Treaty fisheries authorized during 1989–95 targeting on chinook salmon in any preterminal or mixed terminal areas of Puget Sound, unless otherwise agreed;

4.5.3 to continue to limit incidental chinook harvests by appropriate time, gear, and area restrictions for all fisheries that impact weak chinook stocks;

4.5.4

a. to limit the total annual harvest by winter treaty troll in Areas 4B, 5 and 6C and summer treaty troll in Areas 5 and 6C so as not to exceed the 1986–1990 average exploitation rate on contributing Puget Sound stocks applied to the current year estimated abundance of those stocks.

b. The current year abundance and average exploitation rates shall be determined by using the methodology applied under the 1994 and 1995 annual treaty fishing plans.

c. The Signatories agree that the methodology for determining the current year abundance and average exploitation rate may be changed during the term of this Agreement, but only with the consent of all the affected parties to this Agreement.

d. Ceilings will be calculated for each of four time periods (January–April, May–June, July–October, and November–December). Any overage or underage from the November–December time period shall be applied to the ceiling calculated for the subsequent January–April time period. These ceilings do not apply to net fisheries in the Strait of Juan de Fuca that target on local stocks (Hoko Bay, Pysht Bay, Freshwater Bay, Dungeness Bay, Crescent Bay, Clallam Bay), provided that estimates of the impacts of these fisheries on non-local stocks are deemed acceptable by affected tribes;

4.5.5 that the tribes that participate in the Strait of Juan de Fuca chinook winter troll fishery will develop and implement an annual fishing plan for the Strait of Juan de Fuca chinook fishery in consultation with other affected tribes. The plan for each season shall be completed by November 1 of that season, and should include management actions designed to implement the ceilings described above. Those actions may include subdividing the season into time periods with associated limits, size limit restrictions, allocation of chinook between the tribes that fish in the SJF, and/or other appropriate measures to achieve the specified harvests. After November 1 there will be no Strait of Juan de Fuca troll fishery until the tribes that participate in the fishery have agreed to such a plan;

4.5.6 to use only barbless hooks in the SJF troll fishery;

4.5.7 to close the Treaty troll fishery in Areas 4B, 5, 6, and 6C during the spring chinook migration period (approximately April 15–June 15 in Areas 5, 6, and 6C and April 15–30 in Area 4B) subject to complementary actions taken by the State of Washington which result in protection for the stocks of concern equivalent to that provided in their recreational and commercial 1990 regulations package, and by terminal area tribes in their respective fisheries, to limit impacts and enhance these stocks;

4.5.8 that if the exploitation rate on Puget Sound chinook in Treaty ocean troll fisheries deviates by more than 10% from the 1986 through 1990 average exploitation rate scalars on contributing Puget Sound stocks applied to the current year predicted abundance of those stocks, the affected tribes will calculate, for policy action, adjustments to the Strait of Juan de Fuca ceiling that account for the amount of change in impact on Puget Sound chinook that occurs in the Treaty ocean troll fishery.

4.6 Bellingham Bay Treaty Chinook Fisheries. Unless otherwise agreed, in order to improve the opportunity of gillnet fishermen, tribes with fishing rights in Areas 7B or 7C shall not authorize the use of purse seines for more than two days per week, in Areas 7B and 7C. These tribes agree to rescind this provision when they agree it would preclude full harvest that year of the Treaty share of Bellingham Bay chinook. The Nooksack Tribe may open Areas 7B and 7C to gillnet fishing sixteen hours before any other Tribal opening. These tribes will exchange fishing plans prior to opening their fisheries in these areas, and will coordinate their fishery openings.

4.7 Future Chinook Allocation and Management Plans. Recognizing that additional harvests of chinook in all areas are

expected to be possible as chinook rebuilding programs succeed, and prior to the resumption and/or expansion of mixed stock fisheries targeting on Puget Sound chinook, the Signatories agree to make good faith efforts to develop, and implement, prior to the 2000 fishing season, a more comprehensive chinook management and allocation plan. Among other things, the plan shall include:

4.7.1 schedules for rebuilding depressed stocks;

4.7.2 model using Puget Sound chinook cohort reconstruction information, developed cooperatively by the Signatories as soon as possible, but no later than 1999, in order to assess the exploitation rates and to the extent necessary, evaluate required adjustments in them;

4.7.3 consideration of the need, if any, to change the specific fishery limitations described in this section for conservation purposes, and the effectiveness of those limitations in contributing to the rebuilding of chinook stocks; and,

4.7.4 an outline of how harvests of those stocks will be shared.

4.8 Management Information. The Signatories recognize that their ability to improve the condition of chinook stocks and fisheries is hindered by the paucity of existing technical information. Accordingly, in order to develop the longer-term plan referenced in Section 4.7 above, they agree during the next four years to pursue all reasonable efforts to improve their knowledge of the chinook resource, the impacts of fisheries on individual chinook stocks, and their chinook management capabilities. Towards this end, the tribes shall be responsible for overseeing and monitoring existing research and fishery monitoring programs, identifying new programs needed, developing new management tools, and recommending research priorities to policy groups.

4.9 Review. As soon as the chinook model is developed and implemented for Puget Sound, but no later than the year 2000, the tribes shall evaluate this Agreement and determine whether the provisions of this Agreement, including the appropriate target exploitation rates for the Strait of Juan de Fuca troll and net and Ocean troll fisheries, should be rescinded, continued, expanded, or otherwise modified.

4.10 Post Season Audits of Chinook. The Signatories agree that post-season chinook audits should be accorded a high priority among the technical and management projects assigned by the tribes to NWIFC referenced in Section 4.7. These audits can be conducted by the NWIFC and the tribes' Technical Review Committee provided that funding for such audits is available. The audits will use discounts for marine natural mortality. Absent further agreement of the affected tribes, the results of the post-season audits will not be used to alter the chinook ceilings provided for this Agreement.

5. INTERTRIBAL SHARING OF SOCKEYE

5.1 Scope. This section prescribes allocation of the treaty share of Fraser River sockeye and Puget Sound sockeye.

5.2 Sockeye Tribes. The sockeye tribes are the Makah Tribe, the Lummi Indian Nation, The Tulalip Tribes, the Swinomish Indian Tribal Community, the Suquamish Indian Tribe, the Nooksack Indian Tribe, the Lower Elwha S'Klallam Tribe, the Jamestown S'Klallam Tribe, and the Port Gamble S'Klallam Tribe (hereafter the "Sockeye Tribes" although The Tulalip Tribes are not a party to this Agreement).

5.3 Non–Treaty Share. Unless otherwise agreed among the affected parties, the non-treaty share of Fraser River and Puget Sound sockeye shall be as provided in the Puget Sound Salmon Management Plan (PSSMP) and in any other applicable Agreements among the affected parties and the State of Washington.

5.4 Intertribal Allocation of Fraser River Sockeye.

 5.4.1 Annual management plan for Fraser River sockeye. Each year, before fishing begins, the Sockeye Tribes will agree to an annual management plan for Fraser River sockeye. Each year's annual management plan will include the apportionment of a multi-year treaty share (if any) and an annual percent sharing formula for the Strait and Inside fisheries. This formula will be used to determine a target catch for the Strait fishery (see 5.4.2.a below).

| Year | Exploit. Rate | Run Size | Strait Fishery |
|------|---------------|----------|----------------|
| 1996 | 1.55% | 1.56 mill | 24,200 |
| 1997 | 0.50% | 21.3″ | 107,000 |
| 1998 | 0.80% | N/A | N/A. |
| 1999 | 0.75% | N/A | N/A |
| 2000 | 1.55% | N/A | N/A |

The average exploitation rates listed above will be used to compute the minimum Strait fishery target during each season. The actual minimum harvest number will be calculated based on the preseason estimate of the run size times the appropriate average exploitation rate and shall be recalculated each time an in-season update changes the estimate of the Fraser River run size. The actual target percent share for each year can represent a harvest number greater than the minimum, so long as measures are taken to avoid exceeding a rolling

5.4.2 Definition of "Strait" and "Inside" shares.

 a. The Treaty share of Fraser River sockeye shall be divided into a "Strait" share and an "Inside" share. The Strait share is the harvest by tribes in catch areas 4B, 5, and 6C, and the Inside share is the harvest by tribes in catch areas 6, 6A, 6B, 7, 7A, 7B, 7C, 7D, and 7E. The following definitions are as specific as possible given the current uncertain situation with the international allocation for Fraser River sockeye. When annual shares for the treaty tribes are agreed to the Sockeye Tribes will make the annual Strait and Inside shares more specific.

 b. Strait share defined: For the 1996–1999 years (and the 2000 interim year, if necessary) the following average exploitation rates for the Strait fishery, by cycle year, will be used:

four-year Strait share of 12.0% of the total treaty Indian four-year share or 20% of any one year's share.

5.4.3 If a four-year treaty Indian share is established, whose total volume is inadequate to meet the minimum annual Strait fishery targets, without exceeding 12% of the total treaty Indian four-year share, the annual minimums shall be adjusted proportionately in order to avoid exceeding the 12% four-year sharing.

 a. Inside share defined. Each year the Inside share will be that portion

of the Treaty share not projected for harvest in the Strait pursuant to the Sockeye Tribes' annual management plan.

b. Management of the Strait fishery. The preseason fishing plan shall include a schedule for the Strait fishery designed to harvest the target percentage Strait share over the entirety of the sockeye season. The Strait fishery shall be managed inseason, and adjusted if necessary, to achieve as closely as possible the annual target set in the preseason management plan. In the event the annual percentage target is inadvertently reached, or projected to be reached, before the end of the season, any opening in the Strait must be no more extensive than the Inside fishery for the remainder of the Fraser management period.

c. Annual targets are not ceilings or entitlement. The annual percentage targets for the Strait share are not absolute ceilings or entitlements. Should the Strait fishery fail to reach an annual harvest target, or a minimum target based on the exploitation rate, despite a fishery unaffected by the Inside fishery, the uncaught portion of the annual harvest target shall not be transferred to subsequent years' targets. If, on the other hand, the Strait fishery exceeds an annual harvest target due solely to management imprecision, then subsequent years' targets shall not be reduced, subject to the overall four year target, shown in section 5.4.3 a above.

d. Adjustments due Strait fishery. If fishing time for the Strait fishery is reduced due to excessive catches in the Inside fishery, and the annual Strait harvest target is not achieved, the catch the Strait fishery would have taken had it not been curtailed will be estimated. This estimated catch, which shall be computed based on the catch to date and the level of daily catch and effort occurring near the closed time period, and the expected abundance and availability of Fraser River sockeye, shall be added to future years' harvest targets.

5.4.4 Uniform fishing regulations. Unless otherwise agreed, there shall be no separate fishing times or quotas for any of the tribes fishing in Areas 6, 7, and 7A. All tribes shall fish during the same time periods in these areas, using the same regulations pertaining to all legal gear (e.g. net length).

5.5 Intertribal Allocation of Puget Sound Sockeye.

5.5.1 Preterminal Convention Waters' treaty fisheries. Unless otherwise agreed, the treaty sockeye fisheries in the Strait (areas 4B, 5, and 6C) and northern inside preterminal areas (areas 6, 7, and 7A) shall be managed primarily on the basis of objectives for Fraser River stocks. However, the needs of Puget Sound sockeye stocks shall also be taken into account as follows:

Recognizing that the abundance of Lake Washington sockeye will be low for the foreseeable future, sockeye fisheries will not occur in areas 4B, 5, 6, or 6C before mid July unless the count of Lake Washington sockeye at the Hiram Chittenden Locks indicates that a harvestable surplus is available, or unless a fishery is necessary for the full harvest, by the Sockeye Tribes fishing in these areas, of their treaty share of Fraser River sockeye. If

either situation should arise, the Sockeye Tribes shall confer and agree on an appropriate course of action.

5.5.2 Sockeye fisheries in other parts of Puget Sound. It is expected that, for the foreseeable future, incidental harvests of Puget Sound sockeye in fisheries directed at Fraser River sockeye and in fisheries directed at other species, in terminal areas, will consume the entire harvestable amount of sockeye from these runs.

a. Areas 6B and 9: If there are harvestable Lake Washington sockeye, in excess of incidental fishery requirements, identified from this run in any year, then a harvest management plan, which includes sharing of the treaty harvest among tribes fishing in Areas 6B and 9 shall be worked out and agreed to by the tribes that fish in Areas 6B and 9 before any directed fishing commences.

b. Area 10 and Lake Washington System: If there are harvestable Lake Washington sockeye, in excess of incidental fishery requirements, identified from this run in any year; then a harvest management plan, which includes sharing of the treaty harvest among tribes fishing in Area 10 or the Lake Washington System, shall be worked out and agreed to by the tribes that fish in Area 10 or the Lake Washington System before any directed fishery commences.

Whenever up to 50,000 treaty harvestable Lake Washington sockeye are available, and the tribes that fish in Areas 6B and 9 or the Tribes that fish in Area 10 or the Lake Washington System fail to reach agreement, any remaining Treaty harvestable Lake Washington sock-eye, after preterminal incidental interceptions, shall be shared 75%/25% between Muckleshoot and Suquamish respectively.

c. Skagit Bay and Skagit System (Baker Lake/River): Whenever there are treaty harvestable sockeye salmon from the Baker system, any remaining treaty harvestable sockeye, remaining after preterminal incidental interceptions, shall be reserved for terminal area directed fisheries.

6. INTERTRIBAL SHARING OF COHO SALMON

6.1 Scope. This section prescribes allocation of the treaty share of coho, and shall be re-evaluated after the term, at which time the Signatories will determine whether to extend it, modify it, or replace it with an alternative agreement.

6.2 Non–Treaty Harvest Allocation. Unless otherwise agreed among the affected parties, the non-treaty share of coho shall be as provided in applicable orders of the federal courts and the settlement of Subproceeding 83–5.

6.3 Coho Harvest Limitations Applicable to Treaty Preterminal Fisheries. Unless otherwise agreed by all Signatories, given that the coho stocks' status for the next four years is expected to be very low, the low preterminal levels described below shall apply.

6.3.1 Ocean Treaty Troll.

a. Section 5A8.b and the Note in Appendix B of SSMAP defines ocean troll ceilings of 70,000; 90,000; and 125,000 which shall apply in Level 1, 2, and 3 years respectively. However, since the key natural stocks' status for the next four years is expected to be very low, it is anticipated that the 70,000 ceiling will

apply during the term of this Agreement, except lower amounts may apply as provided in 6.3.1 b or c below.

b. When the treaty ocean troll ceiling amount results in terminal area run sizes which are insufficient to meet the escapement requirements which are jointly established with the State of Washington and to provide terminal area treaty fisheries of at least the level shown in SSMAP, the Treaty Indian ocean troll ceiling will be reduced to the extent necessary to provide one-half (in percentage) of the impact reduction compared to that required of Treaty terminal area fisheries from the terminal area SSMAP harvest levels shown in Table B–2, including the note in Appendix B.

c. If the above actions, plus those taken in terminal mixed stock fisheries (see Section 6.7) and in other preterminal fisheries under this Agreement, are insufficient to meet Treaty/Non-treaty allocation targets and allow for terminal incidental catches and agreed update/test fisheries, then the Signatories will negotiate further reductions in all applicable treaty fisheries. Provided, however, that the Treaty troll ceiling for coho salmon shall be adjusted to allow the incidental harvest of coho by agreement, so as to ensure an ocean chinook harvest.

d. The Treaty ocean troll fishery shall be closed no later than September 15 of each year;

e. The Signatories agree to endorse the above provisions, and the ceilings derived from them, in testimony to the PFMC either directly or through the PFMC Tribal represen-

tatives, as unified tribal positions, for the duration of this Agreement.

6.3.2 Strait of Juan de Fuca.

a. No directed coho commercial net fishery for the duration of this Agreement.

b. Frontload sockeye/pink fishery as set forth in this Agreement.

c. Pink years: Sockeye/pink fisheries must close by September 7.

d. Non–Pink years: Sockeye fisheries must close by September 1.

e. If Puget Sound coho abundance is similar to or lower than that predicted for 1994, the troll fishery will be closed from July 1 through October 31.

f. Chum fisheries may start on or after October 15. This puts the entire coho/chum overlap into the coho management period.

g. Prior to each season, the anticipated incidental catch of coho salmon will be estimated using average historical rates of capture. However, if it becomes apparent that incidental catches may greatly exceed these preseason estimates, the tribes will take additional measures, including area/time shaping, consistent with the primary intent of maintaining the tribes' opportunity to participate in the harvest of other species.

6.3.3 Areas 6, 7, 7A.

a. No directed coho commercial (i.e. all fisheries except test fisheries for stock status data collection) net fishery for the duration of this Agreement.

b. Front load sockeye/pink fishery.

c. Pink years: Area 6 sockeye/pink fisheries must close by September 7; Area 7 sockeye/pink must close by September 15; Area 7A sock-

eye/pink open until sockeye/pink share is caught.

d. Non–Pink years: Areas 6 and 7 sockeye fisheries must close by September 7; Area 7A sockeye fisheries open until sockeye share is caught.

e. Chum fisheries regimes in Areas 6, 7, 7A shall be determined in preseason planning each year.

f. Prior to each season, the anticipated incidental catch of coho salmon will be estimated using average historical rates of capture. However, if it becomes apparent that incidental catches may greatly exceed these preseason estimates, the tribes will take additional measures, including area/time shaping, consistent with the primary intent of maintaining the tribes' opportunity to participate in the harvest of other species.

6.3.4 <u>Area 9.</u> No directed coho commercial net fishery.

6.4 <u>Terminal Shares—South Sound.</u>

6.4.1 For reasons based originally on inadequate stock-specific information, and convenience, all fish harvested in Area 10, and areas south of the Area 9/10 line, have been accounted for as South Puget Sound-origin coho, and South Puget Sound-origin coho caught in other terminal areas have been excluded from the South Puget Sound shares. It is, however, recognized that key natural stocks that originate from regions outside South Puget Sound ("non-local" stocks) are present in Areas 10 and 11. For the sole purpose of determining shares as provided in this Section, the Signatories to this Agreement will continue to utilize this accounting method, in all years governed by this Agreement, unless Treaty/Non-treaty allocation accounting changes the way any of the stocks present in Area 10 or 11 fisheries are allocated. In such a case, the breakpoints and percentage shares listed in sections 6.4.3, 6.4.4 and 6.4.6 below will be adjusted to keep coho catches in all areas at approximately the same number of coho as if the current run reconstruction and allocation rules were used. In any event, it is the intent of the Signatories to use the period of this Agreement to estimate the stock-by-stock impacts in each fishery and calculate new algorithms and percentage shares of coho in Area 10 and other areas that would be used if intertribal sharing were based on the harvestable share of all coho that originate from South Puget Sound. For the purposes of this Agreement, the treaty allocation of South Sound coho stocks shall not include any equitable adjustments to account for past imbalances in the treaty/non-treaty allocations.

6.4.2 For the purpose of implementing this Agreement, the Area 10 and 11 shares identified in this Section 6.4 shall be determined and managed inseason according to the best available information. The intertribal allocation accounting shall be based on the post-season audit of stock abundance, treaty catch, escapement, treaty and non-treaty as well as intertribal allocation shares, and determination of paybacks due to intertribal allocation imbalances. Non-landed mortalities (such as "net dropout") shall be allocated to the fishery in which they occur.

6.4.3 The basis for harvest sharing of coho in Area 10 shall be the 1983 <u>Stipulation of Muckleshoot Suquamish and Tulalip Tribes, RE Tulalip Usual and Accustomed Fishing Places, No.</u>

9213—Phase I, (MST Agreement) as amended herein, but only if and so long as the MST Agreement is applied to and treats the other Signatories harvesting coho in Area 10 in the same manner as the MST Tribes. The parties to the MST Agreement shall not make any modifications to the MST Agreement that affect the harvest shares of other Signatories to this Agreement. The harvest pool, as defined therein, shall be modified according to provisions of Sections 6.4.4a and 6.4.4b of this Agreement. The common pool, shall be calculated as the harvest pool minus all equity harvest, and the total treaty harvest in Area 10 shall not exceed more than 20% of the common pool times the number of tribes with established fishing rights in Area 10, plus any equity harvest due. For purposes of this Agreement, the term "tribal group" as used in the MST Agreement shall refer to one or more of the following: Suquamish/Muckleshoot—Central Sound Region Group; Tulalip/Stillaguamish—Stillaguamish/Snohomish Region Group; Swinomish/Upper Skagit/Sauk Suiattle—Skagit Region Group. The "equity harvest" due to any tribal group shall be reduced from that provided for in the MST Agreement by a proportion equal to the number of Tribes per tribal group eligible for equity harvest in Area 10 divided by the total number of Tribes eligible to participate in the Area 10 common pool harvest. For example, if Suquamish/Muckleshoot are due equity from the Area 10 harvest pool based on the original MST Agreement, that equity would be reduced by 2/3 (Suquamish/Muckleshoot due equity divided by Suquamish/Muckleshoot/Tulalip as participants in the common pool harvest—if Tulalip is due equity, its equity would be reduced by 1/3).

6.4.4 The Treaty coho harvest objective for Area 10 shall be calculated as follows:

a. When the treaty allocation of South Sound coho is less than 100,-000 fish, no Treaty directed coho fishery shall be conducted in Area 10. Incidental coho catches during Area 10 chum salmon fisheries will be projected in-season. If this projected catch is exceeded, an amount equal to the excess will be subtracted from the common pool share of the Tribe or Tribal group responsible for the excess, in the next future year in which a directed Treaty coho harvest takes place in Area 10. There will be no payback to Area 10 fishing Tribes if the incidental catch during chum fisheries is less than the projected amount.

b. When the treaty allocation of South Sound coho exceeds 100,000 fish, the Area 10 treaty share shall not exceed the lesser of (1) an amount which permits at least 100,-000 treaty coho, less preterminal treaty interceptions, to pass through Area 10, or (2) that permitted under the MST Agreement, as previously amended in Paragraph 6.4.3. Specifically, the harvest pool will be calculated as follows:

i) at treaty share levels of South Sound coho between 100,000 and 230,000 fish, the harvest pool is 30% of the treaty share, minus the treaty preterminal interceptions of South Sound coho;

ii) at treaty share levels of South Sound coho between 230,000 and 350,000 fish, the harvest pool is 69,-000 fish, plus 57% of the amount above 230,000, less the treaty pret-

erminal interceptions of South Sound coho;

iii) at treaty share levels of South Sound coho above 350,000 fish, the harvest pool is 137,400, plus 30% of the amount above 350,000, less the treaty preterminal interceptions of South Sound coho.

The Area 10 share of each tribe or tribal group will include any incidental coho interceptions of South Sound origin taken by that tribe in fisheries targeting on other species in Area 10 or Area 9, except that, in the event that no Area 10 share is provided for under this Paragraph, incidental coho interceptions, will still be allowed as provided in Section 6.4.4(a) above. A table illustrating the total projected Area 10 coho harvest under various South Sound Treaty shares, based on the modified MST Agreement, is appended to this Agreement.

6.4.5 The remainder of the treaty share of South Sound origin coho, after subtraction of preterminal interceptions and the Area 10 harvest, shall be allocated to the Puyallup, Nisqually, and Squaxin Island Tribes, and to the Suquamish and Muckleshoot Tribes in their respective extreme terminal areas. It is anticipated that the aggregate extreme terminal share of South Sound coho would range from 62% to 85% of the total South Sound Treaty allocation, depending on the size of that allocation.

6.4.6 Deep South Sound (Areas 11–13K) produces 74% of all South Sound coho (Areas 10–13K). This 74% shall be multiplied by the total South Sound treaty share to arrive at the deep South Sound origin portion of the treaty share. The Puyallup Tribe's harvest shares of deep South Sound-

origin coho in Area 11 will be as follows:

a. When the treaty share of deep South Sound Coho is less than 59,-000: No directed coho fishery shall be conducted in Area 11 by the Puyallup Tribe. Incidental coho catches during Area 11 chum fisheries will be projected in-season; if this projected catch is exceeded, this excess will be subtracted from subsequent Area 11 coho fisheries. There will be no payback to the Puyallup Tribe if the incidental catch during chum is less than projected.

b. When the treaty share of deep South Sound Coho is 59,000 through 180,000: 5.0% of the portion of the treaty allocation between 59,000 and 180,000. If this amount is less than that projected for incidental catches during chum fisheries, then, for purposes of calculating paybacks by the Puyallup Tribe, the share will be the projected incidental catch during chum fisheries; plus

c. When the treaty share of deep South Sound Coho is from 180,000 to 350,000: 6.0% of the portion of the treaty allocation between 180,-000 and 350,000; plus

d. When the treaty share of deep South Sound Coho is above 350,000: 3.6% of the portion of the treaty allocation above 350,000.

6.5 Paybacks.

6.5.1 The shares and levels identified in Section 6, above, for Area 10, shall be adjusted to reflect overages and underages in previous years, based on post-season estimates of catches and shares. When the total Area 10 harvest exceeds its post-season share, a payback shall be owed to the extreme

terminal area in the amount of that excess. When the Area 10 harvest is less than its post-season share, a payback shall be owed to Area 10 by the extreme terminal areas in an amount equal to:

(i) the difference between that harvest and the post-season share, when that harvest exceeded the in-season share; or

(ii) the difference between the in-season share and the post-season share, when that harvest was less than the in-season share.

No adjustments shall be made when the Area 10 harvest of a tribe or tribal group deviated less than 10% from its post-season share, except as provided in Section 6.5.3 below. Overages by one tribal group shall not affect any other tribal groups share in Area 10 in the year of occurrence. Such overages will reduce the extreme terminal fishery of the South Sound Tribes in the year of occurrence, with adjustments made to the extreme terminal shares from the Area 10 share of the tribal group(s) creating the overage in the next year in which a directed Area 10 harvest is allowed and each following such year until paid in full. No payback will be owed to Area 10 by the South Sound Tribes (Puyallup, Nisqually and Squaxin Island) if the total post-season coho return to the Nisqually River, excluding returns to the hatchery, during the year of the Area 10 underage was less than 14,000 fish. When payback is owed to the

Area 10 fishery by the South Sound Tribes, it will be added to the combined harvest shares of Area 10.

6.5.2 When the projected or actual remaining harvest of the Area 10 fishing tribes is less than 10,000 coho, in the interest of conservative management, the uncaught harvest may be carried over until the next year that the Area 10 harvestable share exceeds 20,000. When a payback is owed by the South Sound Tribes, it shall be repaid in the first succeeding year in which the in-season estimate of the Treaty share of South Sound origin coho exceeds 300,-000 coho, and in each following such year, in an amount no greater than 15% of that year's treaty share of the party owing the adjustment, until paid, provided that the affected tribes may agree to a more rapid repayment schedule.

6.5.3 At the end of the term of this Agreement, any accumulated and outstanding deviations shall be repaid by those parties responsible for the deviation. The deviations will be repaid in the first year following the term of this Agreement in which directed coho fisheries are allowed and each succeeding such year until paid.

6.6 Terminal Shares.

6.6.1 It is a goal of this Agreement to allocate at least the following percentages of the Treaty share of coho (including "non-local" interceptions) of each allocation unit to its respective terminal area:

| Allocation Unit | Terminal Share |
| --- | --- |
| Skagit | 55% |
| Stillaguamish/Snohornish | 70% |
| Hood Canal | 70% |
| Strait of Juan de Fuca Tributaries | 55% |
| South Sound | 86% |

In order to achieve the treaty terminal shares the total Treaty harvestable allocation, from each allocation unit must be defined, and preterminal and non-local interceptions must be identified and set at levels that achieve these terminal fishery objectives. At the present time, a predictable method for defining the total treaty harvestable amount has not been agreed to by all Signatories. Therefore, it is uncertain whether the terminal shares can be achieved under the preterminal fisheries levels defined in Section 6.3 and the non-local interceptions described in Section 6.7. Thus, at this time, it may not be possible to fully achieve the terminal shares. The sharing relationships between terminal and preterminal fisheries shall be reviewed at the end of the 4 year period of this Agreement. For the long term, when the harvestable volume of coho salmon increases, it is expected that the terminal shares will also increase.

6.6.2 The Signatories to this agreement shall make good faith efforts to utilize the period of this agreement to develop a comprehensive management system for coho salmon that provides a predictable method for determining harvestable numbers in any year. When this system is developed, the preterminal fisheries levels defined in Section 6.3, and the non-local interception levels defined in Section 6.7, shall be adjusted for the remaining term of this Agreement to the extent neces-sary to achieve, on the average, at least the terminal shares listed above.

6.6.3 Regardless whether a comprehensive State-tribal agreement on coho management can be achieved, the Signatories agree that, within 4 years, when it is expected that current analyses of coho runs, catch distribution, cohort reconstruction, sustainable rates of exploitation, and rates of stock productivity are completed, the Signatories will determine how to set their fisheries to achieve defined terminal and preterminal (including non-local) shares for each run, over the entire range of run sizes.

6.7 Non–Local Terminal Area Interceptions.

6.7.1 Purpose and Goal. It is the intent of this Agreement to reduce terminal area interceptions of non-local natural fish. In conjunction with the adjustment of harvest levels called for by sections 6.6.1 and 6.6.2, it is the present goal of the Signatories to reduce nonlocal interceptions by 50% from historic levels, using time/subarea restrictions and other methods, as new data becomes available. It is also the intent of the Signatories to preserve treaty harvest opportunity, historically experienced, in these non-local terminal areas.

The non-local terminal area currently known to apply to each stock are,

| Stock | Area |
|---|---|
| Skagit | 8A, 10 and 11 |
| Stillaguamish | 10 and 11 |
| Snohomish | 10 and 11 |
| Hood Canal | 10 and 11 |

6.7.2 Adjustment Methodology. Adjustments in each non-local terminal area shall be those derived under the provisions of sections 6.7.3 or those derived under section 6.7.4. Provided, however, that prior to implementing those derived under 6.7.3 and by August 15, 1996, the affected Signatories shall perform technical evaluations to assess the effect of 6.7.3 and 6.7.4 and shall prepare any necessary procedural and method adjustments including the possibility of the selection of a single method for the agreement of the affected Signatories.

6.7.3 The first method for determining whether an adjustment is necessary, and the calculation of such adjustment, is as follows:

a. Step One: Harvest Levels. Initially determine the projected treaty harvests of natural coho salmon in terminal and preterminal fisheries according to applicable court orders, agreements, and other provisions of this Agreement. No adjustment shall be required in the Area 8A, Area 10, or Area 11 treaty fishery whenever the total pre-season projected treaty harvest (direct or incidental) of coho salmon within Area 8A, 10 or 11 respectively, as would be adjusted under 6.7.3c, is equal to or less than 10,000 coho.

b. Step Two: Non-local Terminal Percentage. For each of the natural stocks listed in 6.7.1, the predicted percentage of the treaty share of harvest of that stock which would be taken in each applicable non-local area shall be determined and compared to the following 1989–1993 mean non-local harvest percentage by area, as set forth below:

| | 1989–93 Mean Percent | | 80% of 1989–93 Mean | |
| Stock | Area 8A | S.Sound | Area 8A | S.Sound |
| Skagit | 8.9% | 7.0% | 7.1% | 5.6% |
| Stillaguamish | | 7.1% | | 5.7% |
| Snohomish | | 8.1% | | 6.5% |
| Hood Canal | | 10.5% | | 8.4% |

c. Step Three: Adjustments [1]. If the percentage of the treaty share of the harvest of that stock in any of the applicable non-local terminal areas identified in 6.7.1 (Areas 8A, 10 and 11) exceeds eighty percent (80%) of the 1989–93 mean percent, then the impact on non-local fish, in that area must be reduced until it no longer exceeds 80% of the 1989–1993 mean percent impact, or the fishery meets the criteria of section 6.7.3 a above.

6.7.4 Notwithstanding anything in section 6.7.3, the following method shall apply if it would result in a greater reduction in non-local terminal area harvest:

a. Step One: Harvest Levels. Initially determine the projected treaty harvests of coho salmon in terminal and preterminal fisheries according to applicable court orders, agreements, and other provisions of this Agreement.

b. Step Two: Non-local Terminal Percentage. The predicted U.S. harvest rate, that is, the percentage of the U.S. wild run size (catch plus

---

[1]. 1989–1993 Mean Percent proportional impacts and reductions therefrom in the case of the South Sound fishery, shall be calculated separately for Areas 10 and 11.

escapement) of the Skagit River stocks which would be taken in each applicable non-local area, and in its terminal area, shall be determined and compared to the following 1989–1993 mean percentage non-local harvest rates by area, as set forth below:

| Stock | Terminal Area | 1989 Mean U.S. Harvest Rate | | 64% of 1989–93 Mean | | 80% of 1989–93 Mean | |
|---|---|---|---|---|---|---|---|
| | | Area 8A | South Sound | Area 8A | South Sound | Area 8A | South Sound |
| Skagit · | 11.2% | 2.2% | 1.7% | 1.4% | 1.1% | 1.8% | 1.35% |

c. Step Three: Terminal Harvest Levels. The predicted terminal share of Skagit natural coho shall be determined and compared with its terminal share listed in 6.6.1.

d. Step Four: Adjustments. If the predicted terminal share is less than the terminal shares listed in 6.6.1 for Skagit coho, and the percentage of the U.S. wild run size of that stock projected to be caught by Treaty fisheries in any of the applicable non-local terminal areas identified in 6.7.1 (Areas 8A, 10 and 11) exceeds sixty-four percent (64%) of the 1989–93 mean harvest rate for that area, then the harvest of non-local fish in that non-local terminal area must be reduced until one of these two criteria are achieved. However, if the Skagit terminal area harvest rate on the U.S. wild run size of that stock is projected to exceed the 1989–1993 mean harvest rate (of 11.2%), then a non-local harvest rate of up to eighty percent (80%) of the 1989–1993 mean U.S. harvest rate (or any higher harvest rate which achieves the respective terminal share listed in 6.6.1) would be permitted.

6.7.5 Sections 6.7.3 and 6.7.4, which provide non-local reductions based primarily upon analysis of non-local harvest of Skagit River and Hood Canal stocks, will also provide significant protection to Stillaguamish–Snoho-mish coho. If the application of either of the non-local reduction methods set forth in those sections to the Stillaguamish–Snohomish stocks would require greater reductions in coho harvests than those for Hood Canal or Skagit stock in any non-local terminal area, the affected Signatories shall make good faith efforts to apply one of those methods, or some other method, which provides results comparable to those provided for Hood Canal and Skagit stocks under 6.7.3 and 6.7.4.

6.7.6 This section does not amend or supersede the provisions in section 6.3.1.c.

6.7.7 Whenever significant non-local interceptions of the Strait of Juan de Fuca natural stock, or any primary natural stock occurs in any other areas, these limitations will need to be considered and expanded accordingly.

6.7.8 All Signatories will support proposals for subarea/time-specific stock-composition studies that can be used to shape fisheries to avoid non-local stocks. WDF's 1991 Saltonstall–Kennedy proposal can be used as a starting point.

6.7.9 The Signatories agree to implement the time and area management adjustments (shaping) necessary to achieve the terminal area returns set forth in 6.6.1 above when the studies indicate that the required reductions in non-local harvests can be achieved

by such shaping. If it turns out that shaping does not lessen the impact to non-local stocks, or shaping is not feasible, then catches in the entire area must be reduced in order to meet the intent of the sharing targets described in Section 6.6.1 or Section 6.7.2, whichever requires the smaller reduction in catch.

6.7.10 For the long term, when harvestable numbers increase, it is expected that the terminal shares, set forth in Section 6.6.1 above, will also increase.

6.7.11 The annual agreed plan to implement the reductions in 6.7.1 through 6.7.10 above, whenever required, shall be completed prior to June 1.

6.7.12 Until the provisions in sections 6.6 and 6.7 of this Agreement that provide for reductions in non-local interceptions in the non-local terminal areas identified in section 6.7.1 are agreed to or otherwise made binding on all Tribes that exercise fishing rights in one of these areas, the Signatories to this Agreement shall not be required to reduce their harvests in that area to meet those objectives. However, if all tribes that exercise fishing rights in one of the non-local terminal areas agree to or are bound by these provisions, but all of the tribes that fish in a second non-local terminal area are not so bound, the provisions of this section 6.7.12 shall apply to the second area but not the first area. Until all tribes that exercise fishing rights in Area 10 agree to or are bound by these provisions, the nonlocal reductions provided in this section shall not be applied in Area 11 during fishing seasons where the treaty harvestable amount in Area 11 is 10,000 coho or less. The Signatories agree to endorse and support the adoption of preseason and in-season planning efforts and negotiations aimed at implementing the provisions of section 6.6 and section 6.7 of this Agreement.

## 7. INTERTRIBAL SHARING OF CHUM SALMON

7.1 Scope. This section shall govern the intertribal sharing in treaty Indian fisheries for chum salmon, originating in Puget Sound and British Columbia streams, and harvested in Puget Sound marine and freshwater areas lying east of Tatoosh Island. Prior to the end of the term, the Signatories shall evaluate its performance and will determine whether to extend it, modify it, or replace it with an alternate agreement.

7.2 British Columbia Chum Salmon Allocation.

7.2.1 Non-treaty harvest allocation. In the western and eastern Strait of Juan de Fuca fisheries (Areas 4B, 5, and 6C) and (Area 6) respectively, it is assumed that there shall be no non-treaty fisheries directed at chum salmon, for the duration of this Agreement.

7.2.2 Treaty/ non-treaty allocation. Additionally, it is assumed that in the eastern Strait of Juan de Fuca and San Juan Islands (Areas 6, 7, 7A), the annual limit to the harvest, established by the applicable provisions of the Pacific Salmon Treaty or, lacking such provisions, by the State and Tribal managers, shall be shared 50/50 between the treaty and non-treaty fisheries. To the extent that treaty fisheries occur in Areas 6 and/or 6A, those harvests shall be included in the annual treaty ceiling established for Areas 7 and 7A. The treaty or non-treaty share may be further adjusted

by adding or subtracting equitable adjustment paybacks for prior years, per the Puget Sound Salmon Management Plan (PSSMP).

7.2.3 Intertribal Sharing. In the western Strait of Juan de Fuca, eastern Strait and San Juans' fisheries, the participating tribes shall only enact openings that have been agreed-to by all participants, utilize uniform net length restrictions, and each participating tribe shall authorize the same open periods in each fishery.

7.3 Puget Sound Chum Salmon Allocation.

7.3.1 Non-treaty harvest allocation. It is assumed that unless otherwise agreed among affected parties, in any year, the non-treaty share of chum salmon shall be 50% of the harvestable number of each race (summer, fell and winter), of chum salmon originating from each Puget Sound region, except the Mowing aggregations shall be permitted: Hood Canal summer plus fall; and South Puget Sound summer plus fall plus winter.

7.3.2 Intertribal sharing intent. It is a goal of Intertribal Allocation to continue to allocate the great majority of the Treaty share of chum (including "non-local" interceptions) of each allocation unit to its respective terminal area fisheries. The measures shown below may be further adjusted as additional information affecting the feasibility of achieving this goal becomes available. During the period of time that this Agreement is in force, because of the lack of adequate information on area-specific stock composition, no specific action shall be mandated, preseason or in-season, to regulate the harvest of non-local chum salmon captured in mixed-terminal areas (7B, 8, 8A, 10,

12), unless the Signatories agree otherwise. However, the Signatories shall develop a coordinated approach to account post-season for all catches from each region of origin. It is the intent of all Signatories to design the management measures necessary to regulate all interceptions (including non-local), to achieve their stated (or as may be modified) sharing intent in the future. The sharing relationships between terminal and preterminal fisheries shall be reviewed at the end of the four year period of this Agreement, and adjustments will be made in the sharing proportions if necessary.

7.3.3 All tribes will support proposals for stock-composition studies that can be used to quantify impacts to individual allocation units and help to shape fisheries to control such impacts. The current Strait of Juan de Fuca, San Juans, Area 10, Area 12, Area 8, and Area 8A GSI studies can be used as a starting point.

7.4 Management for Intertribal Sharing. For the period controlled by this Agreement, the Signatories shall control interceptions using the fishery—specific measures outlined below. Prior to the conclusion of this Agreement, the Signatories shall evaluate the success of this Agreement by comparing the results achieved against the Signatories intent, as outlined in this Agreement. This evaluation shall be used by the Signatories to formulate a longer term sharing plan. For the duration of this Agreement, the following measures shall be in effect.

7.4.1 Western Strait of Juan de Fuca (Areas 4B, 5, 6C). Annual ceiling catch—based management with three ceiling levels of catch: 20,000 when the harvestable number of fell chum of all Puget Sound regions, except

Hood Canal, is 380,000 or less. 50,000 when the harvestable number of fall chum of all Puget Sound regions, except Hood Canal, is greater than 380,000 and less than 760,000. 60,000 when the harvestable number fell chum of all Puget Sound regions, except Hood Canal, is greater than, 760,000; or when the harvestable number of fell chum from all Puget Sound regions, including Hood Canal, exceeds 1,320,000. The above run abundance measures have been used as surrogate measures for the abundance of Puget Sound natural fall chum salmon.

7.4.2 Whenever 50,000 or 60,000 ceilings are appropriate, openings must be designed to spread the harvest across the fall chum management period. Chum-directed fisheries shall not be authorized during the summer or winter chum management periods.

7.4.3 The ceiling harvest amounts prescribed for this fishery shall be established annually on the basis of preseason forecasts. The ceiling amounts are not entitlements i.e. if the tribes participating in this fishery fail to take their allowable harvest, there will be no carryover to another year.

7.4.4 However, if post season information indicates that the wrong level of harvest was assigned, an adjustment equal to the difference between the actual catch and that of the correct level, shall be made in the first year in which there is a harvestable surplus from which the adjustment may be taken. If this fishery, through management error, exceeds its ceiling, it shall owe a payback payable in the first future year in which a ceiling of 50,000 or more is available. However, no annual payback shall be required for amounts of 2,500 fish or less, but at the end of this Agreement, all payback amounts shall become due. Pay-

back amounts (including the 2,500) and schedules shall be as defined in the Puget Sound Salmon Management Plan.

7.4.5 _Eastern Strait of Juan de Fuca and San Juans (Areas 6, 7, 7A)._ Annual ceiling catch—based management with ceilings established as 50% of the Pacific Salmon Treaty or (in its absence) U.S. managers established (as appropriate) ceiling for this fishery. If the Area 6 fishery remains outside any internationally established limit, its catch shall be included in the annual treaty catch ceiling established for Areas 7 and 7A. Chum—directed fisheries shall not be authorized during the summer or winter chum management periods.

7.4.6 _Area 8 (Skagit Bay)._ Fisheries directed at fall chum salmon shall be managed to harvest Skagit—origin fell chum salmon and stock composition work will be undertaken to monitor the by-catch of non-local fell chum.

7.4.7 _Area 8A (Port Gardner—Port Susan)._ Fisheries directed at fell chum salmon shall be managed to harvest Stillaguamish / Snohomish—origin fall chum salmon and stock composition work will be undertaken to monitor the by-catch of non-local fall chum.

7.4.8 _Area 9 (Admiralty Inlet)._ No commercial fishery openings shall be authorized through the year 1999. However, during this period, the tribes who are otherwise allowed to fish in Area 9 (the Area 9 tribes), in consultation with affected tribes, will implement annual research (test and/or evaluation) fisheries in this area, in order to gather information to fulfill the following objectives:

a. Obtain catch-per-effort and catch-ability information, necessary for

· the formulation of catch-predictive models for fall chum salmon in Area 9 fisheries.

b. Investigate the feasibility of development of databases for the purpose of improving the reliability of early in-season updated estimates of abundance of the fall chum salmon stocks contributing to Area 9 fisheries.

c. Assess the fall chum stock composition at various portions of Area 9, as funding allows.

7.4.9 Any such research fisheries shall be pursuant to an annual experimental design developed by a technical team, appointed by the Area 9 tribes. The technical team shall develop, in consultation with affected tribes, an annual experimental design of the research fishery in this area, in order to accomplish the above objectives. In late 1999 and early 2000, the technical team will provide to all affected tribes an analysis of the study results along with recommendations concerning any application of those results.

7.4.10 The Signatories to this Agreement further agree that after the technical team has reported its findings, an Area 9 harvest sharing plan, similar to that developed in SSMAP, as modified by results available from the foregoing study, will be formulated and implemented. Prior to that time, the Area 9 Tribes also agree to enact Tribal Ordinance revisions as necessary to permit each Tribe to effectively control its effort in any subsequent Area 9 fisheries.

7.5 Area 10 (Edmonds to Vashon). Chum directed fisheries shall not be authorized during the summer or winter chum management periods. During the fall chum management period, fisheries may target on harvestable fall chum salm-on of South Puget Sound origin, and stock composition work will continue to monitor the by-catch of non-local fall chum.

7.5.1 For the purpose of implementing this Agreement, the Area 10 shares identified in this Section shall be determined and managed in-season according to the best available information. The intertribal allocation accounting shall be based on the post-season audit of stock abundance, treaty catch, escapement, treaty and non-treaty as well as intertribal allocation shares, and determination of pay backs due to intertribal allocation imbalances. Non-landed mortalities (such as net dropout) shall be allocated to the fishery in which they occur.

7.5.2 The basis for harvest sharing of chum in Area 10 shall be the 1983 Stipulation of Muckleshoot, Suquamish and Tulalip Tribes, RE Tulalip Usual and Accustomed Fishing Places, No. 9213—Phase I, (MST Agreement) as amended herein, but only if and so long as the MST Agreement is applied to and treats the other Signatories harvesting chum in Area 10 in the same manner as the MST Tribes. The parties to the MST Agreement shall not make any modifications to the MST Agreement that affect the harvest shares of other Signatories to this Agreement. The harvest pool, as defined therein, shall be modified according to provisions of Section 7.5.3 of this Agreement. The common pool, shall be calculated as the harvest pool minus all equity harvest, and the total treaty harvest in Area 10 shall not exceed more than 20% of the common pool times the number of tribes with established fishing rights in Area 10, plus any equity harvest due. For purposes of this

Agreement, tribal group as used in the MST Agreement shall refer to one or more of the following: Suquamish/Muckleshoot—Central Sound Region Group; Tulalip/Stillaguamish—Stillaguamish/Snohomish Region Group; Swinomish/Upper Skagit/Sauk Suiattle—Skagit Region. The equity harvest due any tribal group shall be reduced from that provided for in the MST Agreement according to the following formula. For each tribal group due equity from Area 10, a proportion shall be calculated as the number of Tribes per tribal group eligible for equity harvest in Area 10 divided by the total number of Tribes participating in the Area 10 common pool harvest. The original equity harvest due to each tribal group will then be reduced by this proportion. For example, if Suquamish/Muckleshoot are due equity from the Area 10 harvest pool based on the original MST Agreement, that equity would be reduced by 2/3 (Suquamish/Muckleshoot due equity divided by Suquamish/Muckleshoot/Tulalip as participants in the common pool harvest—if Tulalip is due equity, their equity would be reduced by 1/3).

7.5.3 The Treaty chum harvest objective for Area 10 shall be calculated so as not to exceed that authorized under the MST Agreement, as previously amended. Specifically, the harvest pool will be calculated as follows:

a. at treaty share levels of South Sound summer plus fall chum between 0 and 57,000 fish, the harvest pool is 18% of the treaty share, minus treaty preterminal interceptions of South Sound chum;

b. at treaty share levels of South Sound summer plus fall chum between 57,000 and 119,000 fish, the harvest pool is 10,260 fish, plus 52% of the amount above 57,000, less treaty preterminal interceptions of South Sound chum;

c. at treaty share levels of South Sound summer plus fall chum above 119,000 fish, the harvest pool is 42,-500, plus 18% of the amount above 119,000, less treaty preterminal interceptions of South Sound chum.

The Area 10 share of each tribe or tribal group will include any incidental chum interceptions of South Sound origin taken by that tribe in fisheries targeting on other species in Area 10 or Area 9. A table illustrating the total projected Area 10 chum harvest under various South Sound Treaty shares, is appended to this Agreement.

7.5.4 Initial fishery scheduling by the tribes that fish in Area 10 shall be based on the preseason forecasts of run sizes and anticipated interceptions of South Puget Sound—origin chum. During the season, fishing plans shall be adjusted in response to in season updated estimates.

7.5.5 If overages occur in the annual harvests of the tribes fishing in Area 10, the terminal South Sound share shall be adjusted for that year, to compensate for the overages, and shall be paid back in the following year by way of reduction in the tribal fishery that caused the overage.

7.5.6 It because of management or estimation error, the tribes fishing Area 10 fail to take, or exceed their allowable amount of harvest, as estimated using post-season estimates, payback adjustments will be available as follows:

i) Any necessary adjustments will be made only in years when the total South Sound origin treaty share is greater than 57,000.

ii) No adjustment shall be made for deviations of less than ± 10% of the allowable catch except that deviations in terms of actual underages and overages shall be cumulative and due in full whenever the absolute value of the accumulated deviation exceeds 10% of a year's allowable catch, and the total treaty share exceeds 57,000. However, in no case shall the South Sound tribes be obligated to pay back more than 10% of the extreme terminal South Sound share in any one year. Notwithstanding the above, at the conclusion of this agreement, the cumulative amount of all such deviations shall become due.

7.5.7 It is the intent of the tribes, party to this agreement, to ensure that when the treaty share of summer plus fall chum salmon, of South Puget Sound origin, is less than 57,000, 82% of the share shall be made available for harvest in South Sound terminal areas beyond Area 10. When the total treaty share is between 57,000 and 119,000, 46,740 plus 48% of the share over 57,000 shall be made available for harvest in South Sound terminal areas beyond Area 10. When the total treaty share is over 119,000, 76,500 plus 82% of the share over 119,000 shall be made available for harvest in South Sound terminal areas beyond Area 10.

7.6 <u>South Sound Winter (Late) Chum.</u> For the period covered by this Agreement, there will be no directed Treaty Indian preterminal fisheries directed at the South Sound origin winter (late) chum. Treaty fisheries conducted outside the winter chum management period shall be managed to minimize incidental impacts to South Sound winter (late) chum. The parties agree that an annual harvest of up to 21,500 Nisqually River winter (late) chum salmon shall be reserved exclusively for treaty harvest in the extreme terminal area. As a result, up to 10,750 South Sound-origin summer-fall chum salmon shall be added to the nontreaty share in the following season. It for any reason, the State seeks a share adjustment greater than 10,750 from the treaty share of the summer-fall chum, such matters require the agreement of affected parties.

Further, there shall be no increase in the enhancement of other South Puget Sound winter chum without the agreement of affected parties unless such enhancements have been established in accordance with the Puget Sound Salmon Management Plan.

7.7 <u>Area 12 (North Hood Canal).</u> Fisheries directed at fall chum salmon shall be managed to harvest Hood Canal—origin fell chum salmon and stock composition work will continue to monitor the by-catch of non-local fall chum.

## 8. TECHNICAL WORK.

8.1 General:

8.1.1 The Agreement prescribes the acquisition of technical information with which to address outstanding technical questions which could affect future sharing agreements. Over the period of this Agreement additional technical information will be gathered and assessed to provide a better basis for the negotiation of future allocation agreements. In determining priority tasks, data helpful or required to implement this Agreement should receive the greatest attention. The Signatories agree to participate with other Tribes not Signatories to this Agreement in a process to address the technical tasks described herein and to commit their good faith effort to those tasks.

8.1.2 The definitions for "rebuilding" and "rebuilt" will have an influence on the sharing options available in the future. To the extent that these definitions are a matter of policy the technical tasks associated with them will depend on the definitions.

8.1.3 The informational needs in general appear to fall into similar groupings over all species, while the tasks required to acquire the information varies between species. In general the needed information includes but is not limited to three general areas: 1) productivity of both natural and hatchery stocks; 2) distribution of each stock or group of stocks throughout all fisheries; and 3) catch composition of each fishery by time and area. The tasks required for the accumulation of this information is described below for each species as well as other tasks of importance for that species alone. Other specific tasks as outlined in the agreement will also be addressed.

8.2 Chinook: Many of the answers to questions surrounding chinook management will be tied to the definitions and decisions in other forums such as PSC and PFMC. Tied to these decisions then will be the development of specific schedules for rebuilding of depressed stocks which may limit in the short term options for fully achieving allocation objectives.

8.2.1 Productivity—Assess current and alternative management and enhancement strategies in order to project future levels of abundance. Review current escapement requirements for both natural and hatchery stocks to provide information on the current abundances and insight into the potential future productivity.

8.2.2 Stock distributions—Assess the CWT tagging and sampling programs and utilize information for cohort run reconstruction techniques to assess the distribution of historical catches. With this information, complete work on the chinook predictive model to assess future management options and sharing Agreements.

8.2.3 Catch Composition—Utilizing CWT data assess the composition of catch in individual fisheries. Determine the extent to which time and area shaping may be feasible for individual stocks as a management tool in individual fisheries for both conservation and allocation needs. Evaluate for each fishery the feasibility and applicability of exploitation rate based management.

8.3 Sockeye: While no specific tasks have been identified for Fraser River Sockeye stocks it will be important to keep in mind that future PST Agreements may influence the relationships for sockeye sharing both in terms of intertribal and treaty/non-treaty. The depressed status of Puget Sound sockeye stocks (particularly Lake Washington) warrants the following technical tasks be accomplished.

8.3.1 Assess the feasibility of rebuilding and/or enhancing these stocks. This assessment should include an evaluation of the production, habitat, and harvest issues that may influence the success of any rebuilding attempts.

8.3.2 Support ongoing efforts to identify and correct pre-smolt mortality sources for Puget Sound stocks.

8.4 Coho: With the changing management environment surrounding particularly coho salmon there is a need to evaluate the current management goals and objectives to determine if they are still applicable for the future.

8.4.1 Productivity—The overall productivity of both natural and hatchery stocks needs to be assessed both

in terms of current management as well as future situations. This will include an evaluation of escapement requirements and stock groupings. The beginning bases for this and other assessments will be the cohort run reconstruction using CWT data, the evaluation of the continued feasibility of primary and/or secondary management measures as they are currently being applied to coho, as well as the applicability of the current stock groupings is also needed.

8.4.2 Distribution—Based on the assessment of the CWT cohort reconstruction data determine the distribution of stocks throughout both domestic and international fisheries. Determine impacts on "non-local" stocks in all fisheries.

8.4.3 Composition—The composition of stocks in each fishery needs to be evaluated This can be done using the cohort run reconstruction. Allowable exploitation rates in fisheries can then be assessed as well as evaluating the feasibility of shaping fisheries through time and area measures. The effects of managing for both hatchery and natural exploitation rates in each fishery on individual stocks needs to be assessed.

8.4.4 All of the above is dependent on the completion of the cohort run reconstruction. This will then allow for the update of predictive models used for the assessment of management actions.

8.5 Chum: While chum salmon do not presently appear to be facing productivity problems as other salmon species are there is a definite need to be cognizant that all salmon species populations are cyclical and may in the future face problems.

8.5.1 Distribution—continue and expand current GSI studies to evaluate stock impact distinctions between summer, fall and winter chum stocks. This will provide a better data base for the reconstruction of the run reconstruction data base for chum.

8.5.2 Stock Composition—Evaluate the composition of stocks in each fishery both directed and incidental for the determination of impacts and shaping measures that may be available. This again will require the continuation of the GSI studies to identity stocks taken in each fishery.

8.5.3 Evaluate exploitation rates and provide analysis of appropriate levels for management options. Included will be options for adjusting these rates through fisheries.

8.5.4 The complete revision of the run reconstruction data base is a mandatory task in order to address the above issues as well as determine alternative options for the future.

8.5.5 The Signatories to this Agreement shall support studies to determine differential distribution of coho stocks in Areas 7 and 7A during the latter portion of the coho management period, as well as the early portion of the fall chum management period, in order to gain information necessary for the protection of weak stocks, and improve the accounting of preterminal interceptions.

9. PROCEDURAL LIMITATIONS.

9.1 No Signatory to this Agreement will file prior to April 1, 1999, a request for determination or equivalent pleading against any other Signatory to this Agreement, seeking an intertribal allocation of salmon harvest or harvest opportunity except in accordance with this section. This restriction does not apply to proceedings

initiated to enforce this Agreement or any other agreement or order providing for an allocation of fish between or among tribes.

9.2 All signatories agree that except for issues of conservation and enforcement, each will first restrict any litigation it initiates for intertribal allocation of harvestable salmon to actions or subproceedings which both: (a) seek relief solely against tribes who are not Signatories; and (b) seek relief which is not inconsistent with the fishing regimes set forth herein. Any litigation that seeks a fishery regime that is equivalent to or more restrictive than the fishery regimes set forth herein shall be deemed not inconsistent with such regimes for the purposes of this subsection.

9.3 However, a Signatory may seek to join another Signatory as a defendant or respondent in an action or subproceeding brought initially in compliance with paragraph 9.2 after either of the following two conditions are satisfied:

(a) a court orders, as a preliminary matter, that the proposed defendant or respondent Signatory is a necessary party to the action or subproceeding; or

(b) a court either:

(i) denies,

(ii) declares that it is likely to deny, or

(iii) refuses, notwithstanding a request from a petitioning Signatory, to declare whether it is likely to deny

a significant portion or aspect of the relief requested by the petitioning Signatory, and the petitioning Signatory thereafter meets and confers with the proposed Signatory defendant or respondent in an effort to obtain such relief; or its equivalent, and consensus cannot be reached.

Only an initial ruling of a court is required to satisfy the conditions described in this section 9.3; efforts to seek reconsideration or appeal of such a ruling are irrelevant for this purpose. No Signatory waives any defense to any claim seeking a fishery allocation regime different from the regime set forth in this Agreement.

9.4 This Agreement is further conditioned so that if during the term of this Agreement, a remedy is awarded affecting a Signatory of this Agreement as a result of non-conservation, non-enforcement litigation permitted by this Agreement, then the effective date for that remedy or relief shall be after the end of this Agreement's term, since this Agreement does not permit any Signatory to enforce any judgment obtained regarding fishing regimes for harvestable salmon, other than as provided herein or otherwise agreed by the affected Signatories, during its term.

9.5 Notwithstanding the foregoing subsections 9.1 through 9.4, the Nooksack Tribe may file before April 1, 1999, a request for determination or equivalent pleading against the Lummi Nation, seeking an allocation of the Nooksack River treaty salmon harvest or harvest opportunity between the Nooksack Tribe and the Lummi Nation, and any remedy or relief awarded as a result of such Nooksack–Lummi litigation shall be immediately effective and enforceable.

## 10. COVENANT NOT TO SUE.

The petitioning Signatories have dismissed without prejudice the intertribal harvest allocation claims asserted by them in Subproceeding 86–5. The signing petitioners hereby covenant not to re-file or assert any such intertribal harvest allocation claims against the respondents before April 1, 1999.

## 11. PRINCIPLES.

11.1 It is intended by the Signatories that during the four years this Agreement is in force, all Signatories will devote the necessary efforts to completing the technical tasks outlined in Section 8. It is the understanding of all Signatories that these technical projects will help to provide the essential basis needed to develop a long term intertribal sharing regime for the tribes.

11.2 The producer of fish should reap significant benefits of economic return and stability for production efforts, implementing this "benefits to the producer," principle will benefit all fishers and tribes by encouraging continuing habitat protection and enhancement that benefits both terminal and preterminal fisheries.

11.3 Terminal area tribes are entitled to an opportunity to harvest a fair and equitable portion of the treaty share of the salmon originating in their home region. Absent reasonable management measures, such as those provided for in this Agreement, some of these Tribes could be deprived of a fair and equitable share of the salmon originating in their home region. The Signatories intend this Agreement will minimize the likelihood of an unfair or inequitable distribution of harvest opportunity over the next four years.

## 12. THIRD PARTY BENEFICIARIES.

There are no third-party beneficiaries to this Agreement. The terms and allocations contained in this Agreement were bargained for solely by the Signatories to this Agreement and are intended to benefit only the Signatories.

## 13. EFFECTIVE DATE.

This Agreement shall become effective when all thirteen Signatories have executed this Agreement.

## 14. AUTHORIZATION AND COUNTERPARTS.

Each undersigned representative of the Signatories certifies that he or she is fully authorized to enter into the terms and conditions of this Agreement and to execute and legally bind such Signatory to this document. This Agreement may be executed in counterparts and each shall be treated as an original.

## STIPULATION BETWEEN STATE OF WASHINGTON AND AREA–10–AND–SOUTH TRIBES RE WITHDRAWAL OF STATE'S OBJECTIONS TO AREA–10–AND–SOUTH INTERTRIBAL PLAN

Subproceeding No. 86–5

(May 24, 1996)

The State of Washington, the Squaxin Island Tribe, the Puyallup Indian Tribe, the Nisqually Indian Tribe, the Muckleshoot Indian Tribe, the Suquamish Indian Tribe and the Tulalip Tribes, by counsel, hereby stipulate as follows:

1. The State of Washington hereby withdraws its May 14, 1996, objections no the Intertribal Salmon Allocation Plan for South Puget Sound (Area 10 and South) by and among the Squaxin Island Tribe, the Nisqually Indian Tribe, the Puyallup Indian Tribe, the Muckleshoot Indian Tribe, the Suquamish Indian Tribe and the Tulalip Tribes (hereafter "the Area–10–and–South Intertribal Plan") in consideration of the clarifications and commitments made in this stipulation regarding the purposes and intent of the Area–10–and–South Intertribal Plan.

2. The Area–10–and–South Intertribal Plan is not intended, nor shall it be construed, to modify any presently, effective order or court-adopted plan or agreement, with the exception of the 1983 Stipulation of Muckleshoot, Suquamish and Tulalip

Tribes Re Tulalip Usual and Accustomed Fishing Places, which is modified only as explicitly provided in Sections 6 and 7 of the Area–10–and–South Intertribal Plan.

3. The Area–10–and–South Intertribal Plan provides for allocation only of the treaty share of salmon, available for harvest in South Puget Sound by the six tribes that are parties to the Area–10–and–South Intertribal Plan. The Area–10–and–South Intertribal Plan, including Section 6.1, prescribes no changes in escapement policies established in the Puget Sound Management Plan, as amended. The parties recognize that natural stocks that originate in regions outside South Puget Sound (commonly called nonlocal stocks) are present south of the Area 10/9 line, just as nonlocal stocks are present elsewhere in terminal areas in the case area. The Area–10–and–South Intertribal Plan makes no changes in Court-determined provisions of Treaty/Nontreaty allocations as established in earlier decisions (i.e., the 50/50 sharing between Treaty and Nontreaty entities).

4. The Area–10–and–South Intertribal Plan is not intended, nor shall it be construed, to affect in any manner the State's legitimate exercise of its authority to manage harvest for conservation of stocks in South Puget Sound or elsewhere.

5. The parties to this Stipulation acknowledge that from time to time the State of Washington and the tribes that are parties to the Area–10–and–South Intertribal Plan may enter into management arrangements that may have the effect of further restricting harvests in South Puget Sound to address specific concerns regarding the status of weak stocks present in that area. The Area–10–and–South Intertribal Plan does not prevent the State of Washington and the parties to that plan from negotiating specific management actions that might further reduce treaty harvests in South Puget Sound in relation to the allocated shares provided by that plan.

6. The terms of this Stipulation are deemed incorporated in any order of the Court approving the Area–10–and–South Intertribal Plan.

### ORDER

Upon consideration of the foregoing stipulation, IT IS SO ORDERED.

## INTERTRIBAL SALMON ALLOCATION PLAN FOR SOUTH PUGET SOUND

### (AREA 10 AND SOUTH)

By and Among

The Squaxin Island Tribe

The Nisqually Indian Tribe

The Puyallup Indian Tribe

The Muckleshoot Indian Tribe

The Suquamish Indian Tribe

The Tulalip Tribes

Subproceeding No. 86–5

(March 15, 1996)

TABLE OF CONTENTS

1. AGREEMENT. 1231

2. TERM. 1232

3. UNDERSTANDINGS REGARDING USUAL AND ACCUSTOMED FISHING AREAS. 1232

| | | |
|---|---|---|
| 3.1.1 | Conduct of Fisheries in Area 10. | 1232 |
| | a. Lummi. | 1232 |
| | b. Swinomish. | 1232 |
| 3.1.2 | Conduct of Fisheries in Area 9. | 1232 |
| 3.1.3 | Material Understandings. | 1232 |

4. INTERTRIBAL SHARING OF CHINOOK SALMON. 1233
4.1 Scope. 1233
4.2 Chinook Management and Allocation Basis. 1233
4.2.1 Escapement Policy. 1233
4.2.2 Treaty/Non–treaty Allocation. 1233
4.3 Limitations on Preterminal or Mixed Terminal Treaty Fisheries. 1233

5. INTERTRIBAL SHARING OF SOCKEYE. 1233
5.1 Intertribal Allocation of Puget Sound Sockeye. 1233

6. INTERTRIBAL SHARING OF COHO SALMON. 1234
6.1 Terminal Shares–South Sound. 1234
6.2 Paybacks. 1236
6.3 Terminal Shares. 1237

7. INTERTRIBAL SHARING OF CHUM SALMON. 1237
7.1 Puget Sound Chum Salmon Allocation. 1237
7.1.1 Non–treaty harvest allocation. 1237
7.1.2 Intertribal sharing intent. 1237
7.2 Management for Intertribal Sharing. 1237
7.2.1 Area 8A (Port Gardner–Port Susan). 1237
7.2.2 Area 9 (Admiralty Inlet). 1237
7.3 Area 10 (Edmonds to Vashon). 1238
7.4 South Sound Winter (Late) Chum. 1239

8. TECHNICAL WORK. 1239
8.1 General: 1239
8.2 Chinook: 1240
8.3 Sockeye: 1240
8.4 Coho: 1241
8.5 Chum: 1241

9. CONSULTATION AND EXCHANGE OF MANAGEMENT INFORMATION. 1242

10. PROCEDURAL LIMITATIONS. 1242

11. DISMISSAL WITHOUT PREJUDICE. 1242

12. NO THIRD–PARTY BENEFICIARIES. 1242

13. EFFECTIVENESS OF AGREEMENT. 1242

INTERTRIBAL SALMON ALLOCA-
TION PLAN FOR SOUTH PUGET
SOUND (AREA 10 AND SOUTH)

By and Among

The Squaxin Island Tribe

The Nisqually Indian Tribe

The Puyallup Indian Tribe

The Muckleshoot Indian Tribe

The Suquamish Indian Tribe

The Tulalip Tribes

1. AGREEMENT.

1.1 This Agreement is entered this 15th day of March, 1996, by and among the Muckleshoot Indian Tribe, the Puyallup Indian Tribe, the Squaxin Island Tribe, the Nisqually Indian Tribe (the "petitioners"), the Tulalip Tribes, and the Suquamish Indian Tribe (the "respondents") (hereafter collectively the "Parties").

1.2 The Parties desire to resolve for a term of years the harvest allocation claims and issues among them in Subproceeding 86–5 of *United States v. Washington,* Civil No.C70–9213, United States District Court for the Western District of Washington.

1.3 This Agreement represents a compromise of the Parties' positions regarding the equities of allocation of harvestable treaty salmon in the case of *United States v. Washington.* This Agreement is not intended to serve as a basis for establishing equitable allocation principles outside the context of this Agreement or for determining what might constitute an equitable allocation of harvestable treaty salmon among the Parties after the Agreement expires.

1.4 The Parties enter this Agreement to avoid the risks and burdens of litigation, as well as to devote their resources to further cooperative investigation and research of conditions of the fisheries and the status of stocks of importance to all of the Parties.

1.5 This Agreement sets forth intertribal sharing regimes. These regimes shall be in force for the next four years and shall apply to the harvest of salmon taken in the fisheries of each of the signatories. Unless expressly provided herein, nothing in this Agreement shall affect or alter the provisions of any other intertribal agreement or prior orders of the court regarding treaty fisheries. Nothing in this Agreement is intended to affect or alter the provisions or the effect of the 1996–1999 (2000) Management Plan for Puget Sound and Ocean Fisheries dated August 10, 1995, or its agreed modifications. (The Tulalip, Muckleshoot and Nisqually Tribes are not parties to that plan.).

1.6 This Agreement does not serve as the comprehensive agreement set forth by certain previous court orders and agreements between Tulalip and other tribes. Nothing in this Agreement shall modify, amend, or supersede the Stipulated Settlement Agreement of Swinomish Tribal Community and the Tulalip Tribes dated June 9, 1983 (Docket No. 9071), or the Court's Order Approving Settlement Agreement Between Swinomish Tribal Community and Tulalip Tribes Re Puget Sound Fishing Area Claims dated July 8, 1983 (Docket No. 9190) that incorporated the Settlement Agreement by reference.

1.7 All references herein to SSMAP, the Salmon and Steelhead Management and Allocation Plan, Docket No. 11381, are for convenience only and do not imply adoption of SSMAP, in whole or in part.

1.8 Certain provisions of this Agreement require consent of the "affected parties" before other parties may take action mentioned in such provisions. As used in

such provisions, the term "affected parties" means all parties who, after notice, indicate that such action would affect their interests. For actions that this Agreement contemplates the Parties will take during preseason planning, the Parties agree that notice to all Parties' fisheries directors shall be notice to all affected parties.

## 2. TERM.

2.1 This Agreement shall remain in effect until rescinded by one or more of the Parties. This Agreement may not be rescinded before the end of the 2000–01 winter troll fishing season. The decision to rescind is within the sole discretion of each signatory. Notice of recision shall be effective on the first April 1 following the giving of the notice.

. 2.2 The term of the Agreement recognizes the fact that, at present, there is insufficient agreed-upon information on stock composition in the various fisheries to permit adequate accounting of impacts and allow for the formation of a consensus on long-term management and allocation plans. The intent of this Agreement is to create the stability in fisheries and intertribal relations for the Parties to undertake the technical and policy work tasks that are needed in order to achieve a longer-term intertribal sharing regime.

2.3 The parties will commit the necessary effort and resources to fulfill the requirements of this Agreement as long as it remains in effect.

2.4 This Agreement when approved by the Court will be entered as an enforceable Order of the Court. Prior to June 1 of each year, the preseason plans or agreements developed pursuant to this Agreement shall be filed with the Court and served on all parties to cause no C70–9213.

## 3. UNDERSTANDINGS REGARDING USUAL AND ACCUSTOMED FISHING AREAS.

3.1 It is the understanding of the Parties, that during the term of this Agreement, the conduct of fisheries by the Swinomish and/or Lummi tribes in Areas 9 and 10, shall be governed by the following provisions.

3.1.1 Conduct of Fisheries in Area 10.

a. Lummi. The Lummi Nation will not authorize or conduct fisheries in Washington Department of Fish and Wildlife Commercial Salmon Catch Management and Reporting Area 10 ("Area 10") before the conclusion of the 1999, or as applicable 2000, fishing season. Thereafter, the Lummi Nation will not authorize or conduct fisheries in Area 10 unless it first secures a judicial determination that it has treaty fishing rights in Area 10.

b. Swinomish. The Swinomish Indian Tribal community will not authorize or conduct fisheries in Area 10 unless it first secures a judicial determination that it has treaty fishing rights in Area 10.

3.1.2 Conduct of Fisheries in Area 9.

If the Lummi Nation prevails in Subproceeding 89–2 then, the Lummi Tribe agrees not to exercise any fishing rights which may be confirmed in Subproceeding 89–2 before the conclusion of the 1999, or as applicable 2000, fishing season.

3.1.3 Material Understandings. The Parties' understandings, as stated above, are material facts upon which this Agreement is predicated and are necessary to the implementation of this Agreement.

## 4. INTERTRIBAL SHARING OF CHINOOK SALMON.

4.1 <u>Scope.</u> This section applies to the harvest of chinook salmon stocks that originate or are taken in Puget Sound, the Strait of Juan de Fuca, the San Juan Islands and the Point Roberts Area.

4.2 <u>Chinook Management and Allocation Basis.</u>

4.2.1 <u>Escapement Policy.</u> This chapter prescribes no changes in escapement policies established in the Puget Sound Salmon Management Plan regarding chinook.

4.2.2 <u>Treaty/Non-treaty Allocation.</u> This chapter prescribes no changes in Court-determined provisions governing Treaty/Non-treaty allocations (i.e., 50/50 sharing between Treaty and Non-treaty); nor does it change the existing management and allocation basis of the various races of chinook (e.g., spring chinook, summer/fall chinook).

4.3 <u>Limitations on Preterminal or Mixed Terminal Treaty Fisheries.</u> The fishery limitations prescribed in this Section are the result of the low runs anticipated and are in no way intended to define the potential extent of Treaty chinook fisheries. At the end of the initial term, these limitations will be re-evaluated to determine the extent to which the limitations should be relaxed, expanded, otherwise modified, or terminated. During this initial term, taking into account the depressed condition of Puget Sound chinook stocks and the need for harvest constraints, the Parties agree:

4.3.1 to permit no new treaty fisheries targeting on Puget Sound chinook salmon in any preterminal or mixed terminal areas of Puget Sound. unless otherwise agreed;

4.3.2 to permit no expansion of treaty fisheries authorized during 1989–95 period targeting on Puget Sound chinook salmon in any preterminal or mixed terminal areas of Puget Sound, unless otherwise agreed; and

4.3.3 to continue to limit incidental chinook harvests by appropriate time, gear, and area restrictions for all fisheries that impact weak chinook stocks.

## 5. INTERTRIBAL SHARING OF SOCKEYE.

5.1 <u>Intertribal Allocation of Puget Sound Sockeye.</u> It is expected that, for the foreseeable future, incidental harvests of Puget Sound sockeye in fisheries directed at Fraser River sockeye and in fisheries directed at other species, in terminal areas, will consume the entire harvestable amount of sockeye from these runs. If, however, an additional harvestable amount is available, the following rules apply:

a. <u>Area 10 and Lake Washington System:</u> The basis for harvest sharing in Area 10 and the Lake Washington System shall be the <u>1983 Stipulation of Muckleshoot, Suquamish and Tulalip Tribes, RE Tulalip Usual and Accustomed Fishing Places, No. 9213—Phase I,</u> ("MST Agreement"), provided that nothing in this Plan shall prevent the parties to the MST Agreement from modifying that agreement, if such modification does not affect the harvest shares of other parties to this Agreement.

b. Additionally, if the parties to the MST Agreement fail to reach agreement when a Treaty harvestable share of Lake Washington sockeye of up to 50,000 fish is available, any remaining Treaty harvestable sockeye, after preterminal incidental interceptions, shall be shared

75%/25% between Muckleshoot and Suquamish Tribes respectively.

## 6. INTERTRIBAL SHARING OF COHO SALMON.

### 6.1 Terminal Shares—South Sound.

6.1.1 All coho harvested in Area 10 and areas south of the Area 9/10 line have been accounted for as South Puget Sound origin coho, and South Puget Sound origin coho caught in other terminal areas have been excluded from the South Puget Sound shares. For the sole purpose of determining shares as provided in this Section, the Parties will continue to utilize this accounting method in all years governed by this agreement.

6.1.2 For the purpose of implementing this Agreement, the Area 10 and 11 shares identified in this Paragraph 6.1 shall be determined and managed inseason according to the best available information. The intertribal allocation accounting shall be based on the post-season audit of stock abundance, treaty catch, escapement, treaty and non-treaty as well as intertribal allocation shares. Non-landed mortalities (such as "net dropout") shall be allocated to the fishery in which they occur.

6.1.3 The basis for harvest sharing in Area 10 shall be the MST Agreement as amended herein, provided that nothing in this Agreement shall prevent the parties to the MST Agreement from modifying that Agreement, if such modification does not affect the harvest shares of other parties to this Agreement. The harvest pool, as defined therein, shall be modified according to provisions of Paragraph 6.1.4 of this Agreement. The common pool shall be calculated as the harvest pool minus all equity harvest, and the total treaty harvest in Area 10 shall not exceed more than 20% of the common pool times the number of tribes with established fishing rights in Area 10, plus any equity harvest due. For purposes of this Agreement, the term "tribal group" shall refer to one or more of the following: Suquamish/Muckleshoot—Central Sound Region Group; Tulalip/Stillaguamish—Stillaguamish/Snohomish Region Group; Swinomish/Upper Skagit/Sauk Suiattle—Skagit Region Group (the Swinomish/Upper Skagit/Sauk Suiattle Region will only be treated as a tribal group if the Swinomish Tribe receives judicial confirmation of its usual and accustomed fishing grounds in Area 10 during the term of this Agreement). The "equity harvest" due to any tribal group shall be reduced from that provided for in the MST Agreement by a proportion equal to the number of Tribes per tribal group eligible for equity harvest in Area 10 divided by the total number of Tribes eligible to participate in the Area 10 common pool harvest. For example, if Suquamish/Muckleshoot are due equity from the Area 10 harvest pool based on the original MST Agreement, that equity would be reduced by 2/3 (Suquamish/Muckleshoot due equity divided by Suquamish/Muckleshoot/Tulalip as participants in the common pool harvest. If Tulalip is due equity, its equity would be reduced by 1/3).

6.1.4 The Treaty coho harvest objective for Area 10 shall be calculated as follows:

a. When the treaty allocation of South Sound coho is less than 100,000 fish, no Treaty directed coho fishery shall be conducted in Area 10. Incidental coho catches during Area 10 chum salmon fisheries will

be projected in-season. If this projected catch is exceeded, an amount equal to the excess will be subtracted from the common pool share of the Tribe or Tribal group responsible for the excess, in the next future year in which a directed Treaty coho harvest takes place in Area 10. There will be no payback to Area 10 fishing Tribes if the incidental catch during chum fisheries is less than the projected amount.

b. When the treaty allocation of South Sound coho exceeds 100,000 fish, the Area 10 treaty share shall not exceed the lesser of (1) an amount which permits at least 100,000 treaty coho, less preterminal treaty interceptions, to pass through Area 10, or (2) that permitted under the MST Agreement, as previously amended in Paragraph 6.1.3. Specifically, the harvest pool under the MST Agreement, as amended will be calculated as follows:

i) at treaty share levels of South Sound coho between 100,000 and 230,000 fish, the harvest pool is 30% of the treaty share, minus the treaty preterminal interceptions of South Sound coho;

ii) at treaty share levels of South Sound coho between 230,000 and 350,000 fish, the harvest pool is 69,000 fish, plus 57% of the amount above 230,000, less the treaty preterminal interceptions of South Sound coho;

iii) at treaty share levels of South Sound coho above 350,000 fish, the harvest pool is 137,400, plus 30% of the amount above 350,000, less the treaty preterminal interceptions of South Sound coho.

The Area 10 share of each tribe or tribal group will include any incidental coho interceptions of South Sound origin taken by that tribe in fisheries targeting on other species in Area 10 or Area 9, except that, in the event that no Area 10 share is provided for under this Paragraph 6.1.4, incidental coho interceptions will still be allowed as provided in Paragraph 6.1.4(a). A table illustrating the total projected Area 10 coho harvest under various South Sound Treaty shares, based on the modified MST Agreement, is appended to this Agreement.

6.1.5 The remainder of the treaty share of South Sound origin coho, after subtraction of preterminal interceptions and the Area 10 harvest, shall be allocated to the Puyallup, Nisqually, and Squaxin Island Tribes, and to the Suquamish and Muckleshoot Tribes in their respective extreme terminal areas. It is anticipated that the aggregate extreme terminal share of South Sound coho would range from 70% to 85% of the total South Sound Treaty allocation, depending on the size of that allocation.

6.1.6 Deep South Sound (Areas 11–13K) produces 74% of all South Sound coho (Areas 10–13K). This 74% shall be multiplied by the total South Sound treaty share to arrive at the deep South Sound origin portion of the treaty share. The Puyallup Tribe's harvest shares of deep South Sound-origin coho in Area 11 will be as follows:

a. When the treaty share of deep South Sound Coho is less than 59,000: No directed coho fishery shall be conducted in Area 11 by the Puyallup Tribe. Incidental coho catches during Area 11 chum fisheries will be projected in-season; if

this projected catch is exceeded, this excess will be subtracted from subsequent Area 11 coho fisheries. There will be no payback to the Puyallup Tribe if the incidental catch during chum is less than projected.

b. When the treaty share of deep South Sound Coho is between 59,000 and 180,000: 5.0% of the portion of the treaty allocation between 59,000 and 180,000. If this amount is less than that projected for incidental catches during chum fisheries, then, for purposes of calculating Pay backs by the Puyallup Tribe, the share will be the projected incidental catch during chum fisheries; plus

c. When the treaty share of deep South Sound Coho is between 180,000 and 350,000: 6.0% of the portion of the treaty allocation between 180,000 and 350,000; plus

d. When the treaty share of deep South Sound Coho is above 350,000: 3.6% of the portion of the treaty allocation above 350,000.

6.2 Paybacks.

6.2.1 The shares and levels identified in Section 6, above, for Area 10. shall be adjusted to reflect overages and underages in previous years, based on post-season estimates of catches and shares. When the total Area 10 harvest exceeds its post-season share, a payback shall be owed to the extreme terminal area in the amount of that excess. When the Area 10 harvest is less than its post-season share, a payback shall be owed to Area 10 by the extreme terminal areas in an amount equal to:

i) the difference between that harvest and the post-season share, when that harvest exceeded the in-season share; or

ii) the difference between the in-season share and the post-season share, when that harvest was less than the in-season share.

No adjustments shall be made when the Area 10 harvest of a tribe or tribal group deviated less than 10% from its post-season share, except as provided in Paragraph 6.2.4 below. Overages by one tribal group shall not affect any other tribal group's share in Area 10 in the year of occurrence. Such overages will reduce the extreme terminal fishery of the South Sound Tribes in the year of occurrence, with adjustments made to the extreme terminal shares from the Area 10 share of the tribal group(s) creating the overage in the next year in which a directed Area 10 harvest is allowed and each following such year until paid. When the projected or actual remaining harvest of the Area 10 fishing tribes is less than 10,000 coho, in the interests of conservative management, the uncaught harvest may be carried over until the next year that the Area 10 harvestable share exceeds 20,000.

6.2.2 No payback will be owed to Area 10 by the South Sound Tribes if the total post-season coho return to the Nisqually River, excluding returns to the hatchery, during the year of the Area 10 underage was less than 14,000 fish. When payback is owed to the Area 10 fishery by the South Sound Tribes, it will be added to the combined harvest shares of the Tribes, fishing in Area 10. When a payback is owed by the South Sound Tribes, it shall be repaid in the first succeeding year in which the in-season estimate of the Treaty share of South Sound origin coho exceeds 300,000 coho, and in each following such year, in an amount no greater than 15% of that

year's treaty share of the party owing the adjustment, until paid, provided that the affected tribes may agree to a more rapid repayment schedule.

6.2.3 At the end of the term of this Agreement, any accumulated and outstanding deviations shall be repaid by those parties responsible for the deviation. The deviations will be repaid in the first year following the term of this Agreement in which directed coho fisheries are allowed.

6.3 Terminal Shares.

It is a goal of this Intertribal Allocation Agreement to allocate at least 86% of the Treaty share of coho to the South Sound terminal areas.

## 7. INTERTRIBAL SHARING OF CHUM SALMON.

7.1 Puget Sound Chum Salmon Allocation.

7.1.1 Non-treaty harvest allocation. It is assumed that unless otherwise agreed among all affected parties, in any year, the non-treaty share of chum salmon shall be 50% of the harvestable number of each race (summer, fall and winter) of chum salmon originating from each Puget Sound region, except the following aggregations shall be permitted: Hood Canal summer plus fall; and South Puget Sound summer plus fall plus winter.

7.1.2 Intertribal sharing intent. It is a goal of Intertribal Allocation to continue to allocate the great majority of the Treaty share of chum (including "non-local" interceptions) of each allocation unit to its respective terminal area fisheries. The measures shown below may be further adjusted as additional information affecting the feasibility of achieving this goal becomes available.

7.1.3 All tribes will support proposals for stock-composition studies that can be used to quantify impacts to individual allocation units and help to shape fisheries to control such impacts. The current Strait of Juan de Fuca, San Juans, Area 10, Area 12, Area 8, and Area 8A GSI studies can be used as a starting point.

7.2 Management for Intertribal Sharing. For the period controlled by this Agreement, the Parties shall control interceptions using the fishery—specific measures outlined below. Prior to the conclusion of this Agreement, the Parties shall evaluate the success of this Agreement by comparing the results achieved against the Parties' intent, as outlined in this Agreement. This evaluation shall be used by the parties to formulate a longer-term sharing plan. For the duration of this Agreement, the following measures shall be in effect.

7.2.1 Area 8A (Port Gardner–Port Susan). Fisheries directed at fall chum salmon shall be managed to harvest Stillaguamish/Snohomish—origin fall chum salmon and stock composition work will be undertaken to monitor the by-catch of non-local fall chum.

7.2.2 Area 9 (Admiralty Inlet). No commercial fishery openings shall he authorized through the year 1999. However, during this period, the tribes who are otherwise allowed to fish in Area 9 (the Area 9 tribes), in consultation with affected tribes, may implement annual research (test and/or evaluation) fisheries in this area, in order to gather information to fulfill the following objectives:

a. Obtain catch-per-effort and catchability information, necessary for the formulation of catch-predictive models for fall chum salmon in Area 9 fisheries.

b. Investigate the feasibility of development of databases for the purpose of improving the reliability of early in-season updated estimates of abundance of the fall chum salmon stocks contributing to Area 9 fisheries.

c. Assess the fall chum stock composition at various portions of Area 9, as funding allows.

7.2.3 Any such research fisheries shall be pursuant to an annual experimental design developed by a technical team, appointed by the Area 9 tribes. The technical team shall develop, in consultation with affected tribes, an annual experimental design of the research fishery in this area, in order to accomplish the above objectives. In late 1999 and early 2000, the technical team will provide to all affected tribes an analysis of the study results along with recommendations concerning any application of those results.

7.3 Area 10 (Edmonds to Vashon). Chum—directed fisheries shall not be. authorized during the summer or winter chum management periods. During the fall chum management period, fisheries may target on harvestable fall chum salmon of South Puget Sound origin, and stock composition work will continue to monitor the by-catch of non-local fall chum.

7.3.1 For the purpose of implementing this Agreement, the Area 10 shares identified in this Section shall be determined and managed in-season according to the best available information. The intertribal allocation accounting shall be base on the post-season audit of stock abundance, treaty catch, escapement, treaty and non-treaty as well as intertribal allocation shares, and determination of pay backs due to intertribal allocation imbalances. Non-landed mortalities (such as net dropout) shall be allocated to the fishery in which they occur.

7.3.2 The basis for harvest sharing in Area 10 shall be the MST Agreement as amended herein, provided that nothing in this Agreement prevents the parties to the MST Agreement from modifying that Agreement, if such modification does not effect the harvest shares of other parties to this Agreement. The harvest pool, as defined therein, shall be modified according to provisions of Paragraph 7.3.3 of this Agreement. The common pool, shall be calculated as the harvest pool minus all equity harvest, and the total treaty harvest in Area 10 shall not exceed more than 20% of the common pool times the number of tribes with established fishing rights in Area 10, plus any equity harvest due. For purposes of this Agreement, tribal group shall refer to one or more of the following: Suquamish/Muckleshoot—Central Sound Region Group; Tulalip/Stillaguamish—Stillaguamish/Snohomish Region Group; Swinomish/Upper Skagit/Sauk Suiattle–Skagit Region Group (the Swinomish/Upper Skagit/Sauk Suiattle Region will only be treated as a tribal group if the Swinomish Tribe receives judicial confirmation of their usual and accustomed fishing right in Area 10 during the term of this Agreement). The equity harvest due any tribal group shall be reduced from that provided for in the MST Agreement according to the following formula. For each tribal group due equity from Area 10, a proportion shall be calculated as the number of Tribes per tribal group eligible for equity harvest in Area 10 divided by the total number of Tribes participating in the Area 10 common pool harvest. The original

equity harvest due to each tribal group will then be reduced by this proportion. For example, if Suquamish/Muckleshoot are due equity from the Area 10 harvest pool based on the original MST Agreement, that equity would be reduced by 2/3 (Suquamish/Muckleshoot due equity divided by Suquamish/Muckleshoot/Tulalip as participants in the common pool harvest. If Tulalip is due equity, their equity would be reduced by 1/3).

7.3.3 The Treaty chum harvest objective for Area 10 shall be calculated so as not to exceed that authorized under the MST Agreement, as previously amended. Specifically, the harvest pool will be calculated as follows:

a. at treaty share levels of South Sound summer plus fall chum between 0 and 57,000 fish, the harvest pool is 18% of the treaty share, minus treaty preterminal interceptions of South Sound chum;

b. at treaty share levels of South Sound summer plus fall chum between 57,000 and 119,000 fish, the harvest pool is 10,260 fish, plus 52% of the amount above 57,000, less treaty preterminal interceptions of South Sound chum;

c. at treaty share levels of South Sound summer plus fall chum above 119,000 fish, the harvest pool is 42,-500, plus 18% of the amount above 119,000, less treaty preterminal interceptions of South Sound chum.

The Area 10 share of each tribe or tribal group will include any incidental chum interceptions of South Sound origin taken by that tribe in fisheries targeting on other species in Area 10 or Area 9. A table illustrating the total projected Area 10 chum harvest under various South Sound Treaty shares is appended to this Agreement.

7.4 South Sound Winter (Late) Chum. For the period covered by this Agreement, there will be no Treaty Indian preterminal fisheries directed at the South Sound origin winter (late) chum. Treaty fisheries conducted outside the winter chum management period shall be managed to minimize incidental impacts to South Sound winter (late) chum. The Parties agree that an annual harvest of up to 21,500 Nisqually River winter (late) chum salmon shall be reserved exclusively for treaty harvest in the extreme terminal area. As a result, up to 10,750 South Sound-origin summer-fall chum salmon shall be added to the non-treaty share in the following season. If, for any reason, the State seeks a share adjustment greater than 10,750 from the treaty share of the summer-fall chum as compensation for its under-harvested share of winter (late) chum (including catch by "recreational opportunity" fisheries) in the preceding season, such adjustments shall require the agreement of all affected parties.

## 8. TECHNICAL WORK.

8.1 General:

8.1.1 This Agreement prescribes the acquisition of technical information with which to address outstanding technical questions which could affect future sharing agreements. Over the period of this Agreement additional technical information will be gathered and assessed to provide a better basis for the negotiation of future allocation agreements. In determining priority tasks, data helpful or required to implement this Agreement should receive the greatest attention. The Parties agree to participate with other Tribes not parties to this Agreement in a process to address the technical tasks described herein and to commit their good-faith efforts to those tasks.

8.1.2 The definitions for "rebuilding" and "rebuilt" will have an influence on the sharing options available in the future. To the extent that these definitions are a matter of policy the technical tasks associated with them will depend on the definitions.

8.1.3 The informational needs in general appear to fall into similar groupings over all species, while the tasks required to acquire the information varies between species. In general the needed information includes but is not limited to three general areas: 1) Productivity of both natural and hatchery stocks, 2) distribution of each stock or group of stocks throughout all fisheries, 3) catch composition of each fishery by time and area. The tasks required for the accumulation of this information is described below for each species as well as other tasks of importance for that species alone. Other specific tasks as outlined in the Agreement will also be addressed.

8.2 Chinook: Many of the answers to questions surrounding chinook management will be tied to the definitions and decisions in other forums such as Pacific Salmon Commission and Pacific Fisheries Management Council. Tied to these decisions then will be the development of specific schedules for rebuilding of depressed stocks which may limit in the short term options for fully achieving allocation objectives.

8.2.1 Productivity—Assess current and alternative management and enhancement strategies in order to project future levels of abundance. Review current escapement requirements for both natural and hatchery stocks to provide information on the current abundances and insight into the potential future productivity.

8.2.2 Stock distributions—Assess the CWT tagging and sampling programs and utilize information for cohort run reconstruction techniques to assess the distribution of historical catches. With this information, complete work on the chinook predictive model to assess future management options and sharing agreements.

8.2.3 Catch Composition–Utilizing CWT data assess the composition of catch in individual fisheries. Determine the extent to which time and area shaping may be feasible for individual stocks as a management tool in individual fisheries for both conservation and allocation needs. Evaluate for each fishery the feasibility and applicability of exploitation rate based management.

8.2.4 During the next five years, Makah, Muckleshoot and Nisqually will undertake a joint technical review of the efficacy and necessity of the spring closure of the Strait troll fishery as a management measure to conserve spring-run chinook.

8.3 Sockeye: While no specific tasks have been identified for Fraser River Sockeye stocks it will be important to keep in mind that future Pacific Salmon Treaty Agreements may influence the relationships for sockeye sharing both in terms of intertribal and treaty/non-treaty. The depressed status of Puget Sound sockeye stocks (particularly Lake Washington) warrants the following technical tasks be accomplished.

8.3.1 Assess the feasibility of rebuilding and/or enhancing these stocks. This assessment should include an evaluation of the production, habitat, and harvest issues that may influence the success of any rebuilding attempts.

8.3.2 Support ongoing efforts to identify and correct pre-smolt mortality sources for Puget Sound stocks.

8.4 Coho: With the changing management environment surrounding particularly coho salmon there is a need to evaluate the current management goals and objectives to determine if they are still applicable for the future.

8.4.1 Productivity—The overall productivity of both natural and hatchery stocks needs to be assessed both in terms of current management as well as future situations. This will include an evaluation of escapement requirements and stock groupings. The beginning bases for this and other assessments will be the cohort run reconstruction using CWT data, the evaluation of the continued feasibility of primary and/or secondary management measures as they are currently being applied to coho, as well as the applicability of the current stock groupings is also needed.

8.4.2 Distribution—Based on the assessment of the CWT cohort reconstruction data determine the distribution of stocks throughout both domestic and international fisheries. Determine impacts on "non-local" stocks in all fisheries.

8.4.3 Composition—The composition of stocks in each fishery needs to be evaluated. This can be done using the cohort run reconstruction. Allowable exploitation rates in fisheries can then be assessed as well as evaluating the feasibility of shaping fisheries through time and area measures. The effects of managing for both hatchery and natural exploitation rates in each fishery on individual stocks needs to be assessed.

8.4.4 All of the above is dependent on the completion of the cohort run re-construction. This will then allow for the update of predictive models used for the assessment of management actions.

8.5 Chum: While chum salmon do not presently appear to be facing the productivity problems of other salmon species, there is a definite need to be cognizant that all salmon species populations are cyclical and may in the future face problems.

8.5.1 Distribution—continue and expand current GSI studies to evaluate stock impact distinctions between summer, fall and winter chum stocks. This will provide a better data base for the reconstruction of the run reconstruction data base for chum.

8.5.2 Stock Composition—Evaluate the composition of stocks in each fishery both directed and incidental for the determination of impacts and shaping measures that may be available. This again will require the continuation of the GSI studies to identify stocks taken in each fishery.

8.5.3 Evaluate exploitation rates and provide analysis of appropriate levels for management options. Included will be options for adjusting these rates through fisheries.

8.5.4 The complete revision of the run reconstruction data base is a mandatory task in order to address the above issues as well as determine alternative options for the future.

8.5.5 The parties to this settlement Agreement shall support studies to determine differential distribution of coho stocks in Areas 7 and 7A during the latter portion of the coho management period, as well as the early portion of the fall chum management period, in order to gain information necessary for the protection of weak

stocks, and improve the accounting of preterminal interceptions.

## 9. CONSULTATION AND EXCHANGE OF MANAGEMENT INFORMATION.

9.1 Current Requirements. Both the Puget Sound Salmon Management Plan ("PSSMP"), Docket No. ___ and prior orders of the Court, Docket Nos. ___ provide that certain information shall be shared and that certain other information will be shared upon request. By this Agreement, each party provides notice of its desire to receive the information identified in the PSSMP and above noted Court orders, including regulations issued with respect to any and all salmon, information regarding salmon enhancement activities and plans, and including notice of the availability of any and all research information concerning salmon species which could be harvested in the waters described below:

 a. any of the ocean areas adjacent to the land mass known as Washington;

 b. all parts of the Straits of Juan de Fuca;

 c. the waters known as Puget Sound, including the waters around the San Juan Islands;

 d. Lake Washington; and

 e. all rivers which have, do, or may deliver salmon into the above described waters.

## 10. PROCEDURAL LIMITATIONS.

No party to this Agreement will file prior to April 1, 1999 a request for determination or equivalent pleading against any other Party to this Agreement seeking an intertribal allocation of salmon harvest or harvest opportunity. This restriction does not apply to proceedings initiated to enforce this Agreement or any other Agreement or order providing for an allocation of fish between or among tribes.

## 11. DISMISSAL WITHOUT PREJUDICE.

The petitioners shall dismiss without prejudice the intertribal harvest allocation claims asserted by them in Subproceeding 86–5. The petitioners hereby covenant not to re-file or assert any such intertribal harvest allocation claims against the respondents before April 1, 1999. The respondents shall dismiss without prejudice any equitable allocation claims or counterclaims they may have asserted in Subproceeding 86–5 against the petitioners and will not refile such claims prior to April 1, 1999.

## 12. NO THIRD–PARTY BENEFICIARIES.

There are no third-party beneficiaries under this Agreement. The terms and allocations contained in this Agreement were bargained for solely by the Parties to this Agreement and are intended to benefit only the Parties.

## 13. EFFECTIVENESS OF AGREEMENT.

This Agreement becomes effective upon the entry of an order by the Court in Subproceeding 86–5 approving this Agreement and dismissing without prejudice the claims and counterclaims of the Parties in accordance with Section 8 above.

## AGREEMENT

April 23, 1996

This Agreement is entered this 23rd day of April, 1996, by and between the Muckleshoot Indian Tribe, the Nisqually Indian Tribe, and the Makah Indian Tribe (hereafter the "Parties").

## WHEREAS

A. The Parties desire to settle for a term of years the harvest allocation claims between them in Subproceeding 86–5 of *United States v. Washington*, Civil No. 9213, United States District Court for the Western District of Washington.

B. This Agreement represents a compromise of the Parties' positions regarding the equities of allocation of harvestable treaty salmon in the case area of *United States v. Washington*. This Agreement is not intended to serve as a basis for establishing equitable allocation principles outside the context of this Agreement or for determining what might constitute an equitable allocation of harvestable treaty salmon among the Parties after the Agreement expires.

C. The Parties enter this Agreement to avoid the risks and burdens of litigation, as well as to devote their resources to further investigation and research of conditions of the fisheries and the status of stocks of importance to all the Parties.

The Parties, therefore, agree as follows:

1. Term of Agreement.

A. Four Year Term. This Agreement applies to management of treaty salmon fisheries identified herein beginning at the end of the 1995/1996 troll fishing season in the Strait of Juan de Fuca and will continue through the end of the 1999/2000 troll fishing season in the Strait of Juan de Fuca.

B. One Year Extension. If on or before April 1, 1999, the Parties have not agreed to a new allocation agreement addressing treaty fisheries in the Strait of Juan de Fuca, or to an extension of this Agreement, then the Agreement will remain effective through the end of the 2000/2001 troll fishing season in the Strait of Juan de Fuca.

2. Management and Allocation of Chinook Salmon in the Strait of Juan de Fuca.

A. Limits on Harvest.

(i) The Makah Tribe shall limit its total annual harvest by treaty troll and net fisheries in the Strait of Juan de Fuca so as not to exceed 82.5 percent of the 1986–1990 average exploitation rate on contributing Puget Sound stocks applied to the current year estimated abundance of those stocks.

(ii) The current year abundance and average exploitation rates shall be determined by using the methodology applied under the 1994 and 1995 annual treaty fishing plans. Ceilings will be calculated for each of four time periods (January–April, May–June, July–October and November–December). Any overage or underage from the November–December time period shall be applied to ceilings calculated for the subsequent January–April time period. These ceilings do not apply to net fisheries in the Strait of Juan de Fuca that target on local stocks (Hoko Bay, Pysht Bay, Fresh Water Bay, Dungeness Bay, Crescent Bay, and Clallam Bay), provided that estimates of the impacts of these fisheries on non-local stocks are deemed acceptable by affected tribes.

(iii) The Parties agree that the methodology for determining the current year abundance and average exploitation rate may be changed, but only with the consent of all the Parties to this Agreement. The Parties agree that the Ocean and Strait Chinook fisheries shall be linked to the extent provided in Section 1.6(h) of the document submitted to the Court in subproceeding 86–5 entitled "1996–1999 (2000) Management Plan for Puget Sound and Ocean Fisheries," dated

August 10, 1995 (hereinafter "the August 10, 1995 Plan").

B. Spring Chinook Opening in the Strait of Juan de Fuca. (i) The Makah Tribe will close the treaty troll fishery in Area 4B, 5, 6 and 6C during the spring chinook migration period (approximately April 15–June 15 in Areas 5, 6 and 6C and April 15–30 in Area 4B) subject to complementary actions taken by the State of Washington which result in protection for the stocks of concern equivalent to that provided by WDFW's recreational and commercial 1990 regulations package, and by terminal area tribes in their respective fisheries, to limit impacts and enhance these stocks.

(ii) During the next five years, the Parties will undertake a joint technical review of the efficacy and necessity of the spring closure of the Strait troll fishery as a management measure to conserve spring-run chinook.

C. Post–Season Audits of Chinook. The Parties agree to sponsor the performance of post-season audits of Puget Sound chinook fisheries, provided such audits can be conducted by the tribes' Technical Review Committee and NWIFC using intertribal allocation adult equivalents and provided further that funding for such audits is available. ·The Parties agree that post-season chinook audits should be accorded a high priority among the technical and management projects assigned by the tribes to NWIFC. Absent further agreement of the Parties, the results of the post-season audits will not be used to alter the chinook ceilings provided for in this Agreement.

3. Harvest of Sockeye Salmon in the Strait of Juan de Fuca. The Parties will implement in good faith Section 2.5 of the August 10, 1995 Plan, pertaining to Lake Washington sockeye.

4. Harvest of Coho Salmon in the Strait of Juan de Fuca.

A. No Directed Coho Fisheries. There will be no commercial net fisheries directed to coho salmon in the Strait of Juan de Fuca during the life of this Agreement. This requirement will be implemented through compliance by the Makah Tribe with Section 3.4.B of the August 10, 1995 Plan.

B. Management Measures Relating to Incidental Coho Fisheries. During the season, if it appears that actual coho catches will significantly exceed these preseason estimates, additional management measures shall be taken and/or constraints applied by the Makah Tribe to further reduce coho catches consistent with the primary intent of maintaining its opportunity to participate in the full harvest of other species.

5. Harvest of Chum Salmon in the Strait of Juan de Fuca and in Puget Sound.

A. Strait Chum Fisheries. The Makah Tribe will implement Sections 4.4, 4.5.A and .B, and 4.7 of the August 10, 1995 plan.

B. Winter Chum. The Makah Tribe agrees not to conduct fisheries directed at chum salmon after the ending dates for fall chum fisheries as defined in the best available entry pattern information. The Makah Tribe further agrees to take all practicable measures to minimize identified incidental harvests of winter run chum during the fall chum management period.

6. Strait Tribes' Harvest in the Ocean Treaty Fishery. The Ocean treaty fisheries of the Makah Tribe shall be managed in accordance with Sections 1.1 and 3.4(a) of the August 10, 1995 plan.

7. Consultation and Exchange of Management Information. In recognition of the Parties' common interest in the wellbeing and rebuilding of stocks present in their fisheries, Muckleshoot and the Makah Tribe agree to furnish one another with regulations, notices of openings and management meetings, and reports and studies relating to the stocks identified below, and to permit one another's technical and policy representatives to participate in all meetings regarding plans for harvest management of the stocks listed below:

Muckleshoot—all fisheries harvesting Green River chinook, coho or chum, White River chinook, Lake Washington sockeye or coho, and all Area 10 fisheries.

Makah—Fisheries in the ocean or Strait of Juan de Fuca harvesting any of the following stocks: Hood Canal coho, Green River or White River chinook, Green River or Lake Washington coho, Lake Washington sockeye, Green River chum.

8. Intent to Integrate This Agreement With General Management Regimes. The Parties intend to integrate the provisions of this Agreement into other management regimes. The purpose of integrating this Agreement into such other regimes is to facilitate sound and effective management of the case-area treaty fishery. By agreeing to integrate the terms of this Agreement into other regimes, the Muckleshoot and Nisqually Tribes will not become bound by any other provisions of those regimes, including the August 10, 1995 Plan, to which they have not explicitly consented in this Agreement or otherwise in writing.

9. Covenant Not to Sue. The Muckleshoot and Nisqually Tribes covenant not to initiate against the Makah Tribe before April 1, 1999, a new subproceeding or judicial action asserting any of the intertribal harvest allocation claims previously asserted in subproceeding 86–5. The foregoing covenant shall not have the effect of dismissing or prejudicing the claims or defenses of any Party against any tribe or other entity not a party to this Agreement.

10. Effectiveness of Agreement. This Agreement becomes effective upon the entry of an order by the Court in Subproceeding 86–5 approving this Agreement. This Agreement may be enforced by the Court pursuant to its continuing jurisdiction in *United States v. Washington.*

## ORDER GRANTING MAKAH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING OREGON'S CROSS MOTION FOR SUMMARY JUDGMENT AND WASHINGTON'S MOTION FOR STAY

Subproceeding No. 96–2

(November 4, 1996)

THIS MATTER comes before the court on plaintiff Makah Indian Tribe's motion for partial summary judgment, defendant state of Oregon's cross motion for summary judgment and defendant state of Washington's motion for stay. Having reviewed the motions together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

## I. BACKGROUND

This subproceeding stems from the promulgation by the Secretary of Commerce of a regulation authorizing a treaty fishery for Pacific whiting and rockfish in 1996 and further authorizing the participation of the Makah Indian Tribe in that fishery. Plaintiff Makah seeks a declaratory judgment that: (1) the promulgation of the regulation does not violate Paragraph G.1

of the Order for Program to Implement Interim Plan found in *United States v. Washington*, 459 F.Supp. 1020, 1037 (W.D.Wash.1978);[1] and (2) the provisions of Paragraph G.1 requiring a preliminary determination of treaty right entitlement to nonanadromous fish and shellfish are no longer applicable because the court has already determined that the tribes have such an entitlement.

## II. LEGAL ARGUMENT

### A. Makah Motion for Summary Judgment

██ Makah now moves for summary judgment as to its contention that Paragraph G.1 was not violated. Makah contends that Paragraph G.1 only applies to state regulation of treaty tribe fisheries and does not bar a federal agency from voluntarily recognizing treaty fishing rights or a treaty tribe from exercising those rights pursuant to federal regulation.

Second, Makah moves for summary judgment on the inapplicability of Paragraph G.1's provision requiring a preliminary determination of treaty right entitlement to nonanadromous fish and shellfish on the grounds that this court has already made a final determination on that point. Makah points to Judge Rafeedie's decision in 89-3, another subproceeding in this case. In that decision, Judge Rafeedie held that Makah's and other treaty tribes' treaty "right of taking fish" applies to all species of fish found in their respective adjudicated "usual and accustomed fishing grounds and stations," whether or not those species were actually taken at treaty time. *United States v. Washington*, 873 F.Supp. 1422, 1430 (W.D.Wash.1994). Makah argues that this decision is the law of the case unless and until it is reversed by the Ninth Circuit.

Third, Makah asks for summary judgment on the counter-request by the states of Washington and Oregon for a determination that Makah has no treaty right to take Pacific whiting. Makah again contends that this issue has already been litigated before and decided by Judge Rafeedie in Subproceeding 89-3. The United States supports and joins in Makah's position.

### B. Washington's and Oregon's Responsive Motions

In response, the state of Washington agrees that the Secretary of Commerce did not violate Paragraph G by adopting rules for treaty fishing. However, Washington insists that the Secretary acted contrary to law by not requiring Makah to present prima facie evidence that it fished for Pacific whiting at treaty time. Washington acknowledges Judge Rafeedie's ruling in Subproceeding 89-3 that Makah's and other treaty tribes' treaty "right of taking fish" in their usual and accustomed grounds is not limited to species of fish taken at treaty time. But Washington contends that this ruling is in error and will be reversed by the Ninth Circuit, where it is now pending on appeal. Therefore, Washington asks this court to grant a stay of this case until the Ninth Circuit rules.

1. Paragraph G.1 states in relevant part:

In order to be entitled to exercise off-reservation treaty fishing rights to nonanadromous fish and shellfish, any tribe party to this case shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty entitlements to such nonanadromous fish and shellfish upon which the court may make a preliminary determination as to the tribe's entitlement to such species, pending final determination of tribal treaty-right entitlement to nonanadromous fish and shellfish; ...

The state of Oregon joins Washington in contending that Judge Rafeedie's decision was wrong. But rather than seeking a stay, Oregon moves for summary judgment on its counter-request for a determination that Makah is required to present prima facie evidence that it customarily harvested Pacific whiting at treaty time. Oregon contends that in order to exercise off-reservation treaty rights and obtain treaty-based allocations, Makah must make such a showing. Oregon urges this court to find that Judge Rafeedie's ruling to the contrary was in error, should not be deemed the law of the case, and should not be followed.

## III. COURT'S RULING

■■■ Having carefully reviewed all of the parties' arguments, the court concludes that Judge Rafeedie's ruling in Subproceeding 89-3 should remain the binding law of the case until the Ninth Circuit decides the appeal of that decision now pending before it.

In the alternative, Washington has moved to stay this case pending the Ninth Circuit decision. This motion is denied. Whereas Washington has not alleged any irreparable harm absent a stay, Makah and other tribes could suffer hardship if the resolution of this case is delayed.

NOW, THEREFORE, it is ordered as follows:

1. The court GRANTS Makah's motion for partial summary judgment that the Secretary of Commerce did not violate Paragraph G.1 by promulgating a regulation authorizing a treaty fishery for Pacific whiting and rockfish in 1996 and providing for the participation of Makah in that fishery.

2. The court GRANTS Makah's motion for partial summary judgment on the inapplicability of the provision of Paragraph G.1 requiring a preliminary determination of Makah's treaty right entitlement to fish for Pacific whiting and rockfish in its usual and accustomed fishing grounds in light of Judge Rafeedie's ruling in Subproceeding 89-3, which constitutes the law of the case.[2]

3. The court GRANTS Makah's motion for partial summary judgment on Washington's and Oregon's claims that Makah has no treaty right to take Pacific whiting.

4. The state of Oregon's cross motion for summary judgment and the state of Washington's motion for stay are DENIED.

## DECISION BY THE SPECIAL MASTER

### Subproceeding No. 89-3

### (November 26, 1996)

The Quileute Tribe opened its Dungeness Crab season from November 1, 1996, through October 31, 1997. The State did not object.

The State proposed the following regulation for non-treaty fishers:

The non-Indian fishery will be open from December 1, 1996, until September 15, 1997, 24 hours per day, except as described below:

(1) the area bounded by the following coordinates will be open from January 1, 1997 (unless opening delayed by late

---

**2.** At this time, however, the court declines to grant Makah's request for summary judgment on the issue of whether Paragraph G.1 should be amended to eliminate entirely the requirement for a preliminary determination of trea- ty-right entitlement to nonanadromous fish and shellfish on the grounds that it is no longer applicable under any circumstances. Resolution of this issue should await the outcome of the pending Ninth circuit appeal.

opening of the area described in paragraph (2), below), to September 15, 1997:

(a) north of an east-west line at 47°53'10"N (Quillayute Whistle Buoy);

(b) south of an east-west line at 48°02'15"N;

(c) east of a line delineating the Washington State territorial sea as depicted on NOAA Chart 18480 (Approaches the Strait of Juan de Fuca).

(2) the area bounded by the following coordinates will close on December 31, 1996 or after a period of four weeks of non-Indian fishing, through March 31, 1997, then reopen from April 1, 1997 through September 15, 1997:

(a) south of an east-west line at 47°53'10"N (Quillayute Whistle Buoy);

(b) north of an east-west line at 47°40'30"N(Destruction Island);

(c) east of a line delineating the Washington State territorial sea as depicted on NOAA Chart 18480 (Approaches the Strait of Juan de Fuca).

The Quileute Tribe objected asserting that the State should set a season for non-treaty fishers which delayed opening until January 1, 1997; that the season close after four weeks of fishing and reopen on April 1, 1997, remaining open until September 15, 1997. This would apply in an area from 48°07'36" North Latitude (Sand Point) to 47°31'42" North Latitude (Queets River) and seaward to approximately forty miles from shore.

A hearing was held at Forks, Washington on November 15, 1996. The State of Washington was represented by Jay Geek and Matthew A. Love, Assistants Attorney General; the Quileute Tribe was represented by Ruth Kennedy, Lori Salzarulo and Leslie Barnhart; the Makah Tribe was represented by John Arum and the Quinault Nation was represented by Richard Reich.

An Amicus Curiae brief was submitted on behalf of the Washington Dungeness Crab Fishermen's Association expressing concern that this proceeding might result in recognition of the larger usual and accustomed fishing area claimed by the Quileute Tribe. A letter was submitted on behalf of the Hoh Tribe by its counsel, Richard S. Ralston who had been unavailable when the notice of hearing was received at his office. Mr. Ralston states that the Hoh Tribe is presently in litigation with the Quileute Tribe and the State on the issue of the usual and accustomed fishing grounds and stations and the north, south and western boundaries. That case is pending before Judge Barbara J. Rothstein, Subproceeding 96–1. A copy of Mr. Ralston's letter is attached as requested.

The State's proposed closure for non-treaty fishers recognized a lesser area to the north, south and west than the Quileute Tribe contended for as its usual and accustomed fishing ground.

The Quileute Tribe contends that its treaty right to fish extends westerly forty miles while the State contends that the western boundary is three miles until an adjudication is made by the Court.

## DECISION

The Special Master's decision is as follows:

The State of Washington will open its season for non-treaty Dungeness Crab fishing effective December 1, 1996 to September 15, 1997, EXCEPT THAT the area between 47°40'30" North Latitude (Destruction Island) and 48°02'15" North Latitude and East of a line delineating the Washington State Territorial sea as depicted on NOAA chart 18480 (approaches the Strait of Juan de Fuca) (the twenty-five

fathom line) will be opened on January 1, 1997, and closed on January 30, 1997. The non-treaty season in this area shall then reopen on March 28, 1997, and remain open to the end of the season.

### The Area in Dispute

While the Quileute Tribe concedes that there has not been a final adjudication of its "complete and entire usual and accustomed fishing grounds and stations" it argues that the United States has resolved its western boundary by regulations for allocating salmon and halibut and that this applies to crab as well because the usual and accustomed grounds cannot vary depending on species. However, the Tribe does not recognize the validity of those regulations insofar as they may relate to its northern and southern boundaries.

The Quileute Tribe has asserted a treaty right to fish beyond the three mile limit since approximately 1989, and argues that the status quo should be maintained. However, this proceeding is about closing the non-treaty fishery. There is no status quo supporting the closing of the non-treaty fishery in the larger area claimed by the Tribe.

The boundaries of the usual and accustomed fishing areas are before the Court in another proceeding. Even recognition of the federal regulation as controlling would constitute an adjudication of a question before the Court. For these reasons the closure of non-treaty crab fishing is limited to three miles (twenty-five fathom line), since this is an area which the State is apparently willing to recognize, until an adjudication is made by the Court.

### NON–TREATY CLOSURE IN THE USUAL AND ACCUSTOMED FISHING AREA

The Quileute Tribe claims that the State's regulation does not provide an equal opportunity to harvest its fifty percent share of the harvestable resource and will, unless modified, result in the non-treaty fishers far exceeding its fifty percent. Further, the Tribe contends that crab migrate over the fishing grounds and that the State should therefore be required to regulate the non-treaty fishers beyond three miles to permit the migrating crab to enter the area inside twenty-five fathoms.

The Special Master finds that the closures of the non-treaty crab fishery should be limited to the area between 47°40′30″ North Latitude and 48°02′15″ North Latitude to the twenty-five fathom line for the reasons stated above. However, the Tribe's requested time closures provide the better opportunity for the Tribe to catch its allotted fifty percent of the harvestable crab for the following reasons.

The crab do move across the bottom. However, the evidence is not persuasive on the question of whether this movement represents a true, predictable annual migration pattern or whether the crab movement is more random, perhaps following available food resources. Thus, attempting to draw a factual comparison between a crab "migration" and the migration pattern of salmon is not justifiable under the present evidence.

The Implementation Plan provides that ... Where the sustainable harvest biomass cannot be calculated for a species or area, the harvestable amount to be shared shall be determined using the best fishery management information and practices that ensure conservation and maintain production of shellfish in the area harvested. 2.5a.

Historically, there are no pre-season estimates of the crab which will be available for harvest and the extent of the harvest is not predictable from year to year. A sustainable harvest is maintained by limiting the catch in size (61/4 inch) and to taking

only male crab. Once the season opens the harvest proceeds under these restrictions until completed.

There are no catch data for the area which the State proposes to regulate as the usual and accustomed fishing ground. This area lies within a much larger area, 59A, which is used for reporting fish landings. Further, even the reported landings area not necessarily complete because crab from area 5 9A are landed in Oregon and outside of the 59A area in Washington. Crab landed in La Push do not necessarily demonstrate the Tribal catch because non-treaty boats land there also.

Neither is the intensity of fishing effort as predictable as one would like. However, it does appear that the Tribe has fewer and smaller boats than the non-treaty fishermen and, regardless of estimates as to the number of non-treaty boats which may fish the Tribal area, it appears that there is nothing to limit the number of non-treaty boats once the season opens. Therefore, the fishing effort in terms of the number and size of boats and capacity for setting crab pots is not equal.

The Tribe opened its season November 1, 1996, giving it a one month exclusive fishing opportunity. However, the quality of the crab is not reliable in a fishery at this time of year. In the past the season has opened on December 1st or as soon thereafter as the crab shells have hardened when they are considered ready to be harvested.

The evidence shows that the best crabbing opportunity is when the season first opens. The Tribe considers that December and January present the best opportunity for them. The opportunity to catch crab begins to decline in February. Whether this decline is caused by a rapid rate of catch by the non-treaty fishers as the Tribe contends, or a lessoned appetite, the onset of mating season or a combination of all of these factors is not important here. The evidence is that the crabbing opportunity does decrease after the early months. There appears to be agreement that last year's season did not result in the Tribe's obtaining fifty percent of the catch and it is noted that both parties recognize that a non-treaty closure enhances the opportunity for the Tribe to realize its share.

A State's witness testified that the Tribe would have to increase its number of boats and fish the entire season to catch its fifty percent share. The Quileute fishermen have previously changed to fishing for halibut and other fish at the end of March.

The State has attempted to develop the fishery by managing the time and opportunity for fishing rather than by the utilizing the numbers and has reached several sharing agreements with some other tribes.

In the absence of information as to the total harvest and the shares taken by the Tribe and non-Indians within the usual an accustomed area, the Tribe demonstrated from reported landings in areas 59A and 60, which encompass the much smaller area being discussed here, that the trend is for non-treaty fishers to take fifty percent of the harvest within four to six weeks of the season opening.

If the Tribe's objections to the regulations are sustained and its proposal for closures adopted, the non-treaty boats will have to fish outside the twenty-five fathom line where the fishing is more difficult or relocate to other areas. However, on re-opening in April the non-treaty will be able to take the unharvested crab although the fishing is more difficult than in the first weeks.

The Court's Order RE: Implementation of the Shellfish Proviso the Court states, "It is clear that, under the Treaties as interpreted in the Boldt decision, the Tribes have the absolute right to take fifty

percent of the shellfish from natural beds in the Tribes' usual and accustomed grounds and stations" and provided a framework for the implementation of the Tribe's fishing rights.

The following provisions are of assistance here.

Each Tribe may take, from natural beds, up to fifty percent of the sustainable harvest biomass of any shellfish species within the usual and accustomed areas of the Tribe. The sharing shall be achieved by coordinating management plans. Such sharing shall be subject to the following provisions: 2.5

In sharing the opportunity for harvest of a shellfish resource, the State and Tribe may also consider the time of fishing, quality of the shellfish, ease of harvesting, and catch per unit effort for the shellfish involved to ensure that there is equal sharing of the harvest opportunity. 2.5f

Where there is a shellfish harvest without agreement, the State or affected Tribe(s) shall either comply with this section as needed, or contest the regulation as provided above. When a Tribe authorizes the harvest of shellfish without agreement, then the State shall reduce or adjust State regulated harvests as necessary to allow for the proposed tribal harvest. State regulated harvests shall not take a tribal share of shellfish as defined by the sharing principles, above. Tribal or State fisheries opened under this subsection shall not exceed the tribal or State share authorized by this Court and shall be adjusted by the Special Master, if necessary, to comply with and not exceed the tribal or State share. 4.9

Notwithstanding the absence of reliable information on actual shares harvested by the Tribe and non-treaty fishers, a situation admittedly exists in which the Tribe is not taking fifty percent of the harvest in the usual and accustomed fishing area and possibly will not take fifty percent even with the Tribe's proposed closures, according to the evidence. Closure of usual and accustomed fishing areas to non-treaty fishers is a management tool which is recognized by the State and the Tribe and appears to be the only suggestion for allowing the Tribe to realize its fifty percent of the available harvest.

It is noted that at the present time the Tribe fishes crab only until the end of March. Therefore, the Tribe will have a limited time to take its fifty percent share of the crab and also is limited in the number of boats and gear. These factor could change depending on the Tribe's decision as to the management of its share of the resource. Under these circumstances, in which the Tribe is not taking and possibly cannot take its fifty percent share, it should be allowed to maximize the benefits from the fishing capacity which it has. The evidence is that non-treaty fishers have the capacity to take the crab not harvested by the Tribe. For these reasons, it is recommended that the Tribe's objection to the proposed opening and closing by the State be sustained.

Nothing in this proposed decision is intended to define the Quileute Tribe's usual and accustomed fishing area nor any right of Hoh or any other tribe. The area of regulation is one which avoids the areas to the north and south which are presently before the Court and makes no resolution as to the western boundary of the usual and accustomed grounds.

Finally, attention is directed to so much of the paragraph 4.9 of the Implementation Plan as provides that fisheries opened under that subsection shall not exceed the tribal or State share authorized by the Court and shall be adjusted by the Special

Master, if necessary, to comply with and not exceed the tribal or State share.